UNITED STATES, Appellee

v.

John P. FACIANE, Airman First Class
U.S. Air Force, Appellant.

No. 93–1065.
CMR No. 29923.

U.S. Court of Military Appeals.

Argued June 2, 1994.
Decided Sept. 20, 1994.

For Appellant: *David R. Dowell* (argued); *Colonel Jay L. Cohen* and *Captain Robert A. Parks* (on brief).

For Appellee: *Captain Jane M.E. Peterson* (argued); *Colonel Jeffery T. Infelise* (on brief); *Lieutenant Colonel Thomas E. Schlegel.*

*Opinion of the Court*

GIERKE, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of committing indecent acts upon his 3–year–old daughter, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. The approved sentence imposes a dishonorable discharge, confinement for 3 years, total forfeitures, and reduction to the

lowest enlisted grade. In an unpublished opinion, the Court of Military Review affirmed the findings, reduced the dishonorable discharge to a bad-conduct discharge and, affirmed the remainder of the sentence as adjudged.

This Court granted review of the following issues:

I

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY DENYING A TIMELY REQUESTED, AMPLY JUSTIFIED, SHORT CONTINUANCE NECESSARY TO PROVIDE DETAILED MILITARY COUNSEL TIME AND RESOURCES TO EFFECTIVELY DEFEND APPELLANT.

II

WHETHER THE MILITARY JUDGE ERRED IN DENYING A DEFENSE MOTION TO SUPPRESS A PURPORTED CONFESSION FOR LACK OF CORROBORATION, WHERE THE MILITARY JUDGE IMPROPERLY ADMITTED UNDER MIL.R.EVID. 803(4) THE HEARSAY TESTIMONY ELICITED BY A SOCIAL WORKER SUBSTANTIALLY IN A LAW ENFORCEMENT ROLE AND WHERE THERE WAS ABSOLUTELY NO EVIDENCE OF AN EXPECTATION OF MEDICAL BENEFIT.

We resolve Issue II in appellant's favor and we reverse. Hence, we do not reach Issue I.

*Factual Background*

Mrs. Melissa Deitchman testified that she and appellant were married from August 1986 until February 1991 and had one child, a daughter. They divorced in February 1991. Mrs. Deitchman was awarded custody and appellant was given visitation rights. Beginning in March–April 1991, Mrs. Deitchman noticed that her daughter would wet the bed, have nightmares, would not eat, and would be withdrawn after visiting appellant. She associated it with "having trouble adjust-

ing" to being away from home and then returning.

Mrs. Deitchman began to suspect that appellant was "mistreating ... or neglecting" their daughter "[b]ecause of her behavior and because she was always very dirty when she came home and I never had trouble with her wetting her pants and when I would get her bag of clothes home, all of her pants were wet." During August, when her daughter became severely constipated, Mrs. Deitchman took her to a pediatrician, but the pediatrician indicated nothing "suggestive of abuse."

In October, her daughter's behavior became "extremely worse." Mrs. Deitchman testified:

As soon as she came home she was extremely withdrawn and extremely angry. She could not relax. She was running around the house and throwing her toys. When I put her to bed, she would not relax enough to go to sleep. She was hiding under her bed and crying.

In mid-October, Mrs. Deitchman observed her daughter inserting a toothbrush into her vagina. Mrs. Deitchman told her daughter "that was not nice and she wasn't suppose to do that and then she looked at me and did it again." Mrs. Deitchman testified that she called a child-abuse hotline and was advised to file a police report. Mrs. Deitchman filed a report with the Police Department of Del City, Oklahoma, and then made an appointment for her daughter at Children's Hospital.

Mrs. Deitchman took her daughter to Children's Hospital on October 14, 1990. Mrs. Deitchman testified that she told her daughter that "she was going to go see a doctor and there would be a lady there for her to talk to." Upon further questioning, Mrs. Deitchman testified that she could not "recall exactly" what she told her daughter.

Annita Fancher, a licensed daycare provider who cared for appellant's daughter from January until December 1991, corroborated much of Mrs. Deitchman's testimony regarding the child's behavior. She described the child as "very shy, but very happy," and "very active." Ms. Fancher testified that the child "would cry when she had to separate

from father to mother or mother to father." After the weekend of September 6, 1991, the child was "moreso [sic] angry, withdrawn a little bit more from even everybody in the household." Ms. Fancher also noticed that she would fight with other children, throw food, and "was horrified about going to bed— or to sleep in the afternoon." At first Ms. Fancher thought the changed behavior was due to the departure of her stepbrother, who returned to his mother's custody. During September, however, the child "started showing a great deal of interest in the way that [Ms. Fancher] would change the babies' diapers." After Ms. Fancher finished changing a diaper, the child "would stomp and she was uncontrollable for a little while."

On the evening of October 25, Ms. Fancher was visiting the Deitchman home and observed that Mrs. Deitchman was having difficulty keeping her child in bed. Ms. Fancher went to the child's room and found her in the "very corner" of the closet "with dolls encircled around her, at least two rows of dolls and then clothes on top of her." Ms. Fancher attributed the behavior to "word association." She explained: "Bedtime, nighttime, just on things, you know, that I've dealt with with my own children—sometimes something scares them."

Ms. Fancher testified that in October the child's behavior became "three times worse." She would throw toys, hit younger children, refuse to use the bathroom, and refuse to eat.

Mrs. Cheryl Thornton, a member of the Child Protective Committee at Children's Memorial Hospital in Oklahoma City, interviewed the child on October 14, 1991, after Mrs. Deitchman reported to the Del City Police that she suspected that her child had been abused. Mrs. Thornton's duty in a suspected child abuse case is to "do an interview with the child to help the doctor to know what they need to be looking for, if there are certain tests they need to run." She does not perform medical diagnosis.

Mrs. Thornton's interview took place before any medical examination, but it was incident to an anticipated medical examination. Mrs. Thornton testified as follows:

As I recall, I think mother and I went out and got [the child] in the little waiting area where she was, brought her back to the room where there is an arrangement of toys attached to the wall in one of the exam rooms. I let her begin playing and then the mother left. In doing that, we said mother is going to go out here for a little while and then you and I are going to talk. . . . [S]he did get involved in the toys and did allow mother to go ahead and go out into the waiting area and let just she and myself be in the room.

\* \* \*

She's a very active child. She has a very short attention span. I just let her play with the toys on the wall for a little bit and just talked to her about things, talked about what she was playing with because there were Sesame Street toys on there and we talked about that a little bit. Then I brought out the [anatomically-correct] dolls while she was actually still playing, but then directed her over to where I was with the dolls and then begin [sic] to see if she could identify certain body parts on the dolls.

\* \* \*

They were used, in the beginning, to determine if she could tell certain body parts of the doll as well as demonstrate what she was saying was happening to her.

While playing with the anatomically-correct dolls, the child said, "touched my bottom." Mrs. Thornton asked "who touched her bottom" and the child said, "Daddy." Mrs. Thornton asked if it was "Daddy John [appellant] or Daddy Frank [the child's stepfather]." The child said, "Daddy John." Mrs. Thornton said, "Show me." The child pressed the waist area of the male doll and the female doll together. Mrs. Thornton asked, "Did Daddy put anything in your mouth?" and the child answered, "Yes." Mrs. Thornton asked the child to show her, and the child removed the pants from the male doll, pulled down the underwear, and "grabbed the doll's penis." Mrs. Thornton asked the child "if he had touched her with anything else" and the child said, "Yes." Mrs.

**402**

Thornton testified that "she put her finger near the vaginal area or on the vaginal area of the doll and the rectal area of the doll." Mrs. Thornton "asked her if her Daddy had touched her with his hand or his tee-tee" and she responded, "With his tee-tee." Mrs. Thornton asked the child if anything else happened, but the child "began repeating every question." Mrs. Thornton concluded that "[s]he didn't want to talk about this anymore," and she terminated the interview.

On cross-examination Mrs. Thornton testified that she told the child "something like" she was "going to talk and play with her." Mrs. Thornton did not present herself as a doctor. She did not indicate to the child that she was "going to examine her in any way." She "did not do anything medical with her."

After Mrs. Thornton concluded her interview, the child was examined by a medical doctor. The examination neither indicated nor excluded the possibility of sexual abuse.

Special Agent (SA) Gardner of the Air Force Office of Special Investigations (AFO-SI) interviewed appellant on October 17, 1991, after receiving a complaint from the Del City Police Department. Appellant waived his rights and provided a written statement. In his written statement appellant admitted touching his daughter's vaginal area on three occasions. He stated that "before June 1991" while washing her, his left ring finger "slipped past her vaginal lips into her vagina." Appellant stated that he "became sexually aroused by this, but stopped when I became aware that this was wrong and that I had been doing this for my sexual gratification."

Appellant stated that the second incident occurred in September 1991. Appellant stated that he became "sexually aroused" when he observed his daughter after bathing her. He "touched her vaginal area" but "did not penetrate her."

The third occasion occurred in October 1991 while appellant and his daughter were "playing games with each other" at his home. He again became "sexually aroused" and "pinched her vaginal lips with [his] thumb and forefinger," but "did not penetrate her in any way." Later in the evening, as his daughter was getting dressed for bed, appellant "touched her vaginal lips and asked her if anyone had touched her there." Appellant said he "was concerned because [he] didn't want anyone touching her."

Appellant's typed statement recites, "This statement was prepared based on notes taken during my interview and was typed by SA Gardner." In his own handwriting, appellant added the following to the typed statement: "Concerning the first incindent [sic] I quickly realized what was happening and imediatly [sic] stopped."

At trial, appellant moved to suppress his statement as uncorroborated and to suppress Mrs. Thornton's testimony as inadmissible hearsay. The prosecution argued that appellant's confession was corroborated by Mrs. Thornton's testimony as well as the testimony of Mrs. Deitchman and Ms. Fancher concerning the child's behavior after her visits with appellant. The prosecution further argued that Mrs. Thornton's testimony was admissible as a statement made for the purpose of medical diagnosis in accordance with Mil.R.Evid. 803(4), Manual for Courts-Martial, United States, 1984. The military judge ruled that the child's statements to Mrs. Thornton were admissible under Mil.R.Evid. 803(4) and were sufficient to satisfy the corroboration requirement of Mil.R.Evid. 304(g). Before this Court, appellant contends that the military judge erred. We agree.

 Mil.R.Evid. 304(g) establishes the requirement for corroboration of a confession or admission. It provides in pertinent part as follows:

> An admission or a confession of the accused may be considered as evidence against the accused on the question of guilt or innocence only if independent evidence, either direct or circumstantial, has been introduced that corroborates the essential facts admitted to justify sufficiently an inference of their truth.... If the independent evidence raises an inference of the truth of some but not all of the essential facts admitted, then the confession or admission may be considered as evidence against the accused only with respect to

those essential facts stated in the confession or admission that are corroborated by the independent evidence....

With respect to the quantum of evidence required, Mil.R.Evid. 304(g)(1) provides:

The independent evidence necessary to establish corroboration need not be sufficient of itself to establish beyond a reasonable doubt the truth of facts stated in the admission or confession. The independent evidence need raise only an inference of the truth of the essential facts admitted.

*See United States v. Rounds*, 30 MJ 76 (CMA), *cert. denied*, 498 U.S. 846, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990). The amount of corroboration required is slight and need only raise an inference of truth concerning the essential facts admitted in the confession. *See United States v. Melvin*, 26 MJ 145 (CMA 1988).

■ Mil.R.Evid. 803(4) sets out the medical-diagnosis exception to the hearsay rule. Statements offered under Mil.R.Evid. 803(4) must satisfy a two-pronged test: "first the statements must be made for the purposes of 'medical diagnosis or treatment'; and second, the patient must make the statement 'with some expectation of receiving medical benefit for the medical diagnosis or treatment that is being sought.'" *United States v. Edens*, 31 MJ 267, 269 (CMA 1990) (citations omitted). A key factor in determining whether the second prong is met is "the state of mind or motive of the patient in giving the information ... and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed." *United States v. Clark*, 35 MJ 98, 105 (CMA 1992) (citation omitted). Under proper circumstances, statements made to psychologists, social workers, and other health care professionals may be included under Mil.R.Evid. 803(4). *United States v. Welch*, 25 MJ 23, 25 (CMA 1987). This Court has recognized that "there may be some relaxing of the quantum of proof in those situations where a child is being treated," but even when children are involved, "the facts and circumstances must support a finding that both prongs of the test were met." *United States v. Williamson*, 26 MJ

115, 118 (CMA 1988), *citing United States v. White*, 25 MJ 50 (CMA 1987).

■ The Government argues that the child's statements to Mrs. Thornton satisfy the second prong of Mil.R.Evid. 803(4). Government counsel point to evidence that the child had been taken to a hospital for medical treatment prior to the visit with Mrs. Thornton; Mrs. Deitchman told the child that they were going to the hospital "to see an doctor and talk to a lady," and the child knew that she was in a hospital when she talked to Mrs. Thornton.

We hold that the evidence is insufficient to establish the second prong for admissibility. Although the child may have associated a hospital with treatment and may have known that she was in a hospital when she talked with Mrs. Thornton, there is no evidence indicating that the child knew that her conversation "with a lady" in playroom surroundings was in any way related to medical diagnosis or treatment. Mrs. Thornton testified that she did not present herself as a doctor or do anything medical. There is no evidence that Mrs. Thornton was dressed or otherwise identified as a medical professional. The interview took place in a room filled with toys. There is nothing suggesting that the child made the statements with the expectation that if she would be truthful, she would be helped.

■ Having determined that the statements to Mrs. Thornton were inadmissible, we must next decide whether the testimony of Mrs. Deitchman and Ms. Fancher was sufficient to corroborate appellant's confession. We hold that it was not. Although the Government argues that appellant's exclusive custody of the child establishes that he had access and the opportunity to abuse her, we are unwilling to attach a criminal connotation to the mere fact of a parental visit. While Mrs. Deitchman and Ms. Fancher certainly described a troubled child, that circumstance—especially in the context of recently divorced parents and a recently remarried mother—does not suggest or corroborate sexual abuse.

The decision of the United States Air Force Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and WISS concur.