UNITED STATES

v.

Staff Sergeant James G. SIROKY,
FR522–06–1466, United States
Air Force.

ACM 30646 (Recon).

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 22 Feb. 1993.

Decided 9 June 1995.

Appellate Counsel for Appellant: Colonel
Jay L. Cohen and Captain Robert E. Watson.

Appellate Counsel for the United States: Colonel Jeffery T. Infelise and Colonel Thomas E. Schlegel.

Before DIXON, C.J., HEIMBURG, Senior Judge, and PEARSON, SCHREIER, GAMBOA, and BECKER, JJ., En Banc.

## OPINION OF THE COURT
## UPON RECONSIDERATION

BECKER, Judge:

This case requires us to again examine the limits of the so-called "medical exception" to the hearsay rule, codified at Mil.R.Evid. 803(4), as it applies in cases of alleged sexual child abuse. We previously released our opinion as a panel decision on 2 May 1995.[1] On our own motion we have reconsidered our decision en banc. We adhere to our original decision.

Despite his pleas, members convicted the appellant of one specification of rape of his infant daughter (in violation of Article 120, UCMJ[2]), one specification of sodomy of the daughter (in violation of Article 125, UCMJ[3]), and two specifications of assault consummated by a battery on, respectively, his wife and stepson (in violation of Article 128, UCMJ[4]). The members sentenced the appellant to a dishonorable discharge, confinement for five years, and reduction to E-3.

On appeal, the appellant contends the military judge erred in admitting hearsay statements by his daughter, and that the evidence is factually insufficient to support the convictions. The evidence is sufficient to support the convictions for assault consummated by a battery, and we affirm those findings. However, we hold that the military judge committed prejudicial error in admitting the daughter's statements under Mil.R.Evid. 803(4). Accordingly, we set aside the rape and sodomy convictions, and the sentence. Because of this disposition, we need not address the sufficiency of the evidence supporting the rape and sodomy convictions.

## I. BACKGROUND

Appellant met his wife (whom we will call "V") in 1987, while stationed at Clark Air Base, Republic of the Philippines. At this time, V already had a 5–year–old son ("L") from a previous relationship. After moving in together, the appellant and V had a daughter ("J"), born 10 June 1989. Appellant and V married in March 1990. In June 1991, the appellant and his family evacuated the Philippines after the eruption of Mount Pinatubo, and relocated at Patrick Air Force Base, Florida. Appellant's family life featured much strife, both in the Philippines and at Patrick. According to V and L, the appellant often drank to intoxication, after which he would hit and kick them. Their accounts of physical abuse were, in part, corroborated by neighbors, who often noticed bruises on V and L. In one instance, a neighbor witnessed the appellant striking L in the appellant's back yard. On the other hand, witnesses for the defense described V as dishonest, manipulative, and often emotionally abusive to the appellant.

According to V, in September 1991, she noticed J (now 2 years old) "humping" furniture.[5] V testified that, in October 1991, she discovered the appellant and J sleeping together in a way she found sexually suggestive. She also described finding suspicious hairs in J's diaper. V testified that, in December 1991, she discovered a white substance in V's diaper. V said this jelled her suspicions that her husband had been sexually abusing J. She took her suspicions, along with the diaper, to the Air Force Office of Special Investigations (AFOSI) at Patrick. AFOSI initiated an investigation.[6]

---

1. *United States v. Siroky*, ACM 30646 (A.F.Ct. Crim.App. 2 May 1995).

2. 10 U.S.C. § 920 (1988).

3. 10 U.S.C. § 925 (1988).

4. 10 U.S.C. § 928 (1988).

5. According to later testimony, such sexual "acting out" is common among sexually abused children. However, there was also evidence that J had suffered from pinworms and vaginal infections, which could also account for her rubbing against furniture.

6. Subsequent laboratory testing of the diaper was negative for the presence of semen. Laboratory analysis of a hair found in the diaper classified it as "Negroid" in origin. The appellant is white. V and L are Asian. According to the

Meanwhile, V had retained a Ms. Page as a divorce lawyer. Ms. Page contacted Ms. Lindy Clifton, a child therapist experienced with treating psychological trauma associated with sexual abuse. Ms. Clifton agreed to see J. In the meantime, J had been examined by a Navy physician, who opined that the condition of J's genitalia was abnormal and consistent with penetration.[7] At the request of Ms. Page, the physician formally referred J to Ms. Clifton as a victim of sexual abuse. This was because CHAMPUS[8] requires a physician referral before it will pay the costs of such therapy.

V brought J to see Ms. Clifton for the first time in May 1992, several weeks shy of J's third birthday. In response to questions from the military judge during her testimony on the defense's motion *in limine* to exclude J's statements, Ms. Clifton described their first session:

Q. Okay. Now, when you initially saw [J] on the 4th of May, go over with me again, please, Ms. Clifton, exactly how you initially introduced yourself to her, if you can recall. Did you—

A. I can't—Your Honor, I can't—

Q. —tell her your name or not?

A. —I can't give you word, you know, word for word. Generally, what I do with children, when they're waiting in the waiting room, I come out with a puppet or a toy. I introduce myself to the child. Children call me "Miss Lindy." I will shake their hand and say, "I'm Miss Lindy. Would you like to meet my puppet, Mr. Duck" and we'll sit and pet Mr. Duck for a minute. I'll talk with the parents, then I will ask the child if they would like to go back and see what toys I have. Once we're back there and in front of the parent, I will talk about myself as being a helper. With older children, I

will talk about—if it's through the—if it's a legal case, that I am there as their protector to talk to them for the court.

Q. That wasn't in this case.

A. That wasn't in this case.

Q. No.

A. Okay. I'm off the subject.

Q. But you would typically—

A. The child knew my name, that I was Miss Lindy, that we were going to go back and look at toys. On that first session I talk about that we're here to talk about your feelings and to help you.

Q. Now, you indicated, I think, Ms. Clifton, that initially that [J] was reasonably unresponsive to your efforts.

A. Yes, Sir.

In her earlier testimony on the motion *in limine*, Ms. Clifton had elaborated on J's behavior at their first session:

. . . [J] had a lot of difficulty coming back to the play room. She presented as extremely anxious. She was hyper vigilant, surveying the environment to see what was going on. She was non-verbal. She stood in the corner. She was not willing to interact with any of the toys that I had provided for her.

In later testimony before the members, Ms. Clifton elaborated further on her and J's first meeting:

This child presented as extremely frightened, very anxious. She became very agitated when I attempted to initiate any contact in my playroom with any toys. As she entered the office in her time with me, she was very hyper vigilant, meaning that she was constantly checking out the environment for her safety—a frightened, troubled little girl is how she presented.

---

evidence at trial, no member of the appellant's or V's family has any African or African-American ancestry.

**7.** At trial, another physician (a member of the Brevard County, Florida, Child Protection Team) testified as to his examination of J. In his opinion, the condition of J's genitalia was abnormal and consistent with penetration by some means.

However, the defense countered with medical literature and their own expert's opinion, both to the effect that J's genitalia were within normal limits.

**8.** The Civilian Health and Medical Plan of the Uniformed Services, i.e., the medical insurance program for military family members.

Over succeeding sessions, however, Ms. Clifton described the development of a close and trusting relationship with J:

Q. .... And as your sessions with her progressed, she then became more responsive, is that true?

A. Yes, Sir. She became bonded with me.... [M]eaning that we were developing a relationship, that she saw me as her advocate, that she enjoyed coming to therapy, that she was responsive to my questions and what I would ask her to do, that she felt unconditional positive regard for herself in my office, that it was a friendly and safe place.

Q. And then as she progressed, I think you testified that it reached the point where [J] would permit you to hold her and rock her in your arms.

A. Yes, Sir.

Ms. Clifton also testified that, during the course of the therapy, sometimes J and her mother would refer to her as "doctor," although Ms. Clifton was quick to clarify to the court that she did not hold a doctorate. According to Ms. Clifton, J did not start verbalizing and demonstrating sexual abuse until 24 July 1992. Ms. Clifton described this date as "significantly into my therapy with this child."

The defense moved *in limine* to exclude Ms. Clifton's testimony on multiple grounds, one of which was hearsay. The military judge denied the motion *in limine*, ruling that J's statements to Ms. Clifton satisfied the foundational requirements for the "medical exception" under Mil.R.Evid. 803(4), as well as rejecting the other defense arguments. Pertinent to the hearsay issue, the military judge entered the following findings of fact:

Ms. Clifton initially saw [J] and her mother on the 20th of May 1992 [sic],[9] took a history of alleged abuse from the mother, and started therapy on [J].... Initially, [J] was verbally unresponsive to Ms. Clifton, but she observed the child "humping" furniture and exhibiting masturbatory behavior....

Initially, on 20 May 1992, Ms. Clifton introduced herself to [J] as "Ms. Lindy" and indicated that they were together to talk about [J]'s feelings and to help her. Although the child was initially unresponsive, including curling up into a fetal ball, if you will, the child subsequently opened up—again, my words—became bonded—Ms. Clifton's testimony—and referred to Ms. Clifton on occasion as Doctor, indicated she enjoyed their sessions, her relationship with Ms. Clifton progressing to the point where she—[J]—would permit Ms. Clifton to hold her in her arms and rock her....

The military judge made no express finding that J had an expectation of promoting her well-being by talking to Ms. Clifton. In response to the defense argument that the evidence did not show J had such an expectation, the military judge simply said "... I rule to the contrary" without elaboration.

## II. STANDARDS OF REVIEW

■ In reviewing the admission of J's statements to Ms. Clifton, we will not put ourselves in the shoes of the military judge to see if we would have made the same ruling. Instead, we apply an abuse of discretion standard. *United States v. Dorsey,* 38 M.J. 244, 246 (C.M.A.1993); *United States v. Ortiz,* 35 M.J. 391, 393 (C.M.A.1992); *United States v. Ureta,* 41 M.J. 571, 575 (A.F.Ct. Crim.App.1994). In doing so, we will defer to the military judge's findings of fact unless they are unsupported by evidence of record or clearly erroneous. *United States v. Quigley,* 40 M.J. 64, 66 (C.M.A.1994); *United States v. French,* 38 M.J. 420, 425 (C.M.A. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994); *Ureta,* 41 M.J. at 575.

■ In criminal cases, admission of hearsay necessarily implicates the Confrontation Clause of the Sixth Amendment when there has been no opportunity for an accused to cross-examine the declarant.[10] Our approach

---

9. Ms. Clifton testified that the first session was on 4 May 1992.

10. In this case, J did not testify, and there was no attempt to require her to do so by either party or the military judge. According to the trial counsel, however, J was in the local area if either side

to the confrontation issue differs depending on the particular hearsay exception involved. If the exception is one of the so-called "firmly rooted" exceptions, then compliance with the evidence rule alone will satisfy the Confrontation Clause. *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). If, however, the rule involved is not a "firmly rooted" hearsay exception, then we must examine the statement, beyond the minimum requirements of the evidence rule, for "particularized guarantees of trustworthiness" which make the statement so trustworthy that adversarial testing would add little to its reliability. *Idaho v. Wright,* 497 U.S. 805, 819–820, 110 S.Ct. 3139, 3148–3149, 111 L.Ed.2d 638 (1990).

■ A "statement for purposes of medical diagnosis or treatment" under Mil.R.Evid. 803(4) is a "firmly rooted" hearsay exception. *Id.* at 820, 110 S.Ct. at 3149; *United States v. Clark,* 35 M.J. 98, 105 (C.M.A.1992); *Ureta,* 41 M.J. at 576. Therefore, in reviewing the military judge's ruling for abuse of discretion, we will look to the foundational elements of the rule without searching for additional "particularized guarantees of trustworthiness."

### III. THE "MEDICAL EXCEPTION" AND CHILDREN

■ Mil.R.Evid. 803(4) provides that hearsay statements may be admitted if they are "made for purposes of medical diagnosis or treatment" and describe "medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The courts have condensed this elaborate language into two simple foundational elements. To support admission of hearsay under the "medical exception," the proponent must show:

1. The statement was made for the purpose of medical diagnosis or treatment; and

2. The declarant made the statement with some expectation of promoting his or her

well-being and, thus, had an incentive to be truthful.

*United States v. Armstrong,* 36 M.J. 311, 313 (C.M.A.1993); *United States v. Nelson,* 25 M.J. 110, 112 (C.M.A.1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982 (1988); *Ureta,* 41 M.J. at 576; *United States v. Fling,* 40 M.J. 847, 852 (A.F.C.M.R.1994).

■ J's statements to Ms. Clifton easily meet the medical purpose prong of this test. The scope of Mil.R.Evid. 803(4) is not limited to statements to licensed physicians, but also may include statements to other health care practitioners and therapists. *United States v. Faciane,* 40 M.J. 399, 403 (C.M.A.1994); *United States v. Williamson,* 26 M.J. 115, 118 (C.M.A.1988); *Nelson,* 25 M.J. at 112; *United States v. White,* 25 M.J. 50, 51–52 (C.M.A.1987); *United States v. Welch,* 25 M.J. 23, 25 (C.M.A.1987). Unquestionably, Ms. Clifton needed J to speak to her in order for J's therapy to progress. We conclude, as did the military judge, that J's statements were for the purpose of medical diagnosis or treatment.

■ The sticking point here is the second prong of the test—did J have an expectation that her statements to Ms. Clifton would promote her well-being? As often happens in "medical exception" issues involving children, this is the proverbial "64 Dollar Question":

> The key factor in determining whether a particular statement is embraced by the medical-treatment exception is "the state of mind or motive of the patient in giving the information to the physician and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed."

*United States v. Morgan,* 40 M.J. 405, 408 (C.M.A.1994) (quoting *Clark,* 35 M.J. at 105 and *White,* 25 M.J. at 51). *See also Ureta,* 41 M.J. at 576.

The expectation prong is rarely an issue with adults and older children. Such persons

wanted to speak with her. The military judge made no findings as to J's "unavailability as a witness" under Mil.R.Evid. 804(a), or whether the appellant had waived his right of confronta-

tion. Under the Mil.R.Evid. 803(4) "medical exception," as with other exceptions under Rule 803, the "unavailability" of the declarant is not a prerequisite to admission of the declaration.

easily recognize health care practitioners, and intuitively appreciate the incentive to be truthful. As we said in *Ureta*, a case involving a 13–year–old girl who had described her sexual abuse to a pediatrician:

> It was not required that [the girl] utter some formal affirmation that her statements were for medical purposes in order for them to be admissible under Mil. R.Evid. 803(4), as long as sufficient evidence supports an inference that she had that expectation. [Citation omitted]. The evidence here is sufficient to support such an inference. This is not a case of an infant with limited capability to comprehend that telling the truth will be in her medical best interest. [Citations omitted].

41 M.J. at 576.

As the child-declarant gets younger, the less we can infer about the child's expectation from just the surrounding environment. While courts may be flexible in "relaxing the quantum of proof" with a young child, the proponent of "medical exception" hearsay still must establish both the medical purpose and expectation prongs. *Williamson*, 26 M.J. at 118. "[U]nless it appears that the child declarant knows at least that the person is rendering care and needs the information to help, the rationale for the [medical] exception disappears entirely." *United States v. Avila*, 27 M.J. 62, 66 (C.M.A.1988).

A child-declarant can show this understanding by his or her own statements. *See Morgan*, 40 M.J. at 405 (13–year–old sought counseling for emotions, fears of pregnancy, and impact of sexual abuse); *Quigley*, 40 M.J. at 66 (5–year–old went to doctor to get "help"); *United States v. Deland*, 22 M.J. 70, 73 (C.M.A.), *cert. denied*, 479 U.S. 856, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986) (7 year-old saw psychiatrist because was having nightmares and wanted to feel better). When such expressions are possible, this is the preferred method of satisfying the expectation prong of Mil.R.Evid. 803(4). *United States v. Tornowski*, 29 M.J. 578, 581 (A.F.C.M.R.1989).

■ However, as we stated in *Ureta*, a "formal affirmation" by a child that he or she expects some health benefit is not *per se* required for admission under Mil.R.Evid.

803(4). Nonetheless, the evidence still must support an inference that the child had such an expectation. *See United States v. Moreno*, 36 M.J. 107, 120 (C.M.A.1992) (14 year-old speaking to psychiatrist about depression); *United States v. Edens*, 31 M.J. 267, 269 (C.M.A.1990) (5 and 3 year-old girls understood doctor needed information to help them); *United States v. Dean*, 31 M.J. 196, 203–204 (C.M.A.1990) (6–year–old had been to hospital many times before and expected benefit from truthful answers); *Nelson*, 25 M.J. at 112 (no evidence that 6–year–old's motive in speaking to physician and psychologist was other than for treatment); *White*, 25 M.J. at 50 (evidence showed 7 and 11–year–old girls spoke to doctor to receive treatment for bed-wetting, crying, fears, and other psychological problems); *Welch*, 25 M.J. at 26 (no evidence 12–year–old's motive in talking to psychologist and therapist was other than for treatment); *United States v. Cox*, 42 M.J. 647, 651 (A.F.Ct.Crim.App.1995) (mother explained to 7 and 4–year–old daughters that they were seeing a "counselor" who specialized in helping because the mother did not have the knowledge to make them better); *Fling*, 40 M.J. at 847–848 (7–year–old's statements to medical personnel were a plea for help); *Tornowski*, 29 M.J. at 581 (social worker's opinion that 7–year–old had expectation of "feeling better" satisfied expectation prong, but "marginally so"); *United States v. Lingle*, 27 M.J. 704, 707 (A.F.C.M.R.1988), *pet. denied*, 28 M.J. 455 (C.M.A.1989) (3–year–old's expectation of treatment inferred from number of times she had been to hospital).

It is important to emphasize that the evidence must support an *inference* of expectation. This is not a matter to be *assumed* solely from the fact that a child has spoken to a health care professional. In *Avila*, the Court of Military Appeals held the military judge erred in admitting hearsay from a 4–year–old to her therapist, where the therapist introduced herself as "Kathy," said she was "just another Mommy," and took pains to avoid any appearance of being associated with social workers, finding insufficient evidence to infer the child made her statements with an expectation of treatment. The Court

of Military Appeals recently reached a similar conclusion in *Faciane*. In that case, the accused's wife took their 3–year–old daughter to a hospital "to see an [sic] doctor and talk to a lady." The child had been to a hospital before and may have associated the place with treatment. Notwithstanding, the court found this evidence was insufficient to show the child had an expectation of benefit from her subsequent conversation with "a lady" in the hospital playroom. The court stated:

> Mrs. Thornton [the "lady"] testified that she did not present herself as a doctor or do anything medical. There is no evidence that Mrs. Thornton was dressed or otherwise identified as a medical professional. The interview took place in a room filled with toys. There is nothing suggesting that the child made the statement with the expectation that if she would be truthful, she would be helped.

40 M.J. at 403.

## IV. J's STATEMENTS TO MS. CLIFTON

We hold that the military judge abused his discretion in admitting J's statements to Ms. Clifton under Mil.R.Evid. 803(4). Specifically, we find the evidence is insufficient to show J made her statements with an expectation of promoting her well-being. As noted above, the military judge made no express findings of fact concerning J's expectation. To the extent he may have intended his "I rule to the contrary" comment to be such a finding, it is clearly erroneous.

There is scant evidence supporting any inference that J understood her emotional health depended on her truthful statements to Clifton. J was not yet three years old at the time of her first therapy session. Clifton could not remember what she said to J at this first session, and was only able to testify to "[g]enerally, what I do with children." Even if we accept that Clifton used her typical procedure here, there is nothing in this method to suggest J understood her medical well-being depended on her making truthful statements. Clifton introduced herself only as "Miss Lindy," and did not associate herself with the medical profession in any way. Her only explanation to J was "we're here to talk about your feelings and to help you." In the past, J had been presented for medical examination and treatment. However, no evidence was presented at trial that this infant girl spoke about her symptoms to any practitioner, or otherwise had any prior experience in feeling better after telling someone "where it hurts." There is also no indication J's mother explained to her why she was seeing "Miss Lindy." Although J and her mother referred to Clifton as "doctor" at some point during J's therapy, the evidence does not establish whether this was before or after J made the declarations in issue. It is also unclear whether J understood what "doctor" means, as opposed to merely parroting her mother.

Contrary to the meager evidence offered in support of the inference, other circumstances cast grave doubt on J's comprehension of why she was in Clifton's office on 4 May 1992. It may well be possible for a child of J's age to appreciate the medical incentive to be truthful just from a statement similar to "we're here to talk about your feelings and help you." However, it is clear from Clifton's testimony that J had no such appreciation. To the contrary, J remained frightened and completely uncommunicative after Clifton's introduction. J did not begin describing sexual abuse until late July 1992. There is nothing which ties J's decision to make these statements to Clifton's introductory remarks nearly three months before. Indeed, we cannot infer that J even heard Clifton's words on 4 May, much less understood them and thus appreciated an incentive to be truthful.

The evidence shows Clifton and J eventually bonded closely. However, we see their relationship, from J's point of view, as more "guardian-ward" than "doctor-patient." We have no doubt such a close relationship—almost *in loco parentis*—was much needed in J's life, and greatly facilitated communication between J and Clifton. Nonetheless, our focus here is on Mil.R.Evid. 803(4), and whether J's statements satisfy the *"medical exception"* to the rule against hearsay. This case is much closer to *Avila* and *Faciane* than any of the cases where the courts have inferred a child's expectation of medical benefit. We are mindful of the need to be flexible in relaxing the quantum of proof of

such an expectation in very young children. *Williamson*, 26 M.J. at 118. However, if we hold the evidence here to be sufficient, then we will have relaxed the standard to such a degree that there is no standard at all. This we will not do, as the whole rationale behind the "medical exception" would disappear entirely. *Avila*, 27 M.J. at 66.

We now turn to whether the erroneous admission of J's statements was prejudicial to the appellant's substantial rights. *See* Article 59(a), UCMJ.[11] J's statements to Clifton were the only evidence of sodomy, and the only evidence of penile penetration in support of the rape charge. There is no case for either offense without J's statements. Accordingly, we hold the military judge committed prejudicial error, and must aside the sodomy and rape convictions. In our decretal paragraph, we will authorize a rehearing on these charges and specifications.

We express no opinion whether J's statements to Clifton would be admissible under other hearsay exceptions, in particular the so-called "residual hearsay" exceptions of Mil.R.Evid. 803(24) and 804(b)(5). Although making a limited "fall back" argument under Mil.R.Evid. 803(24), the prosecution did not seriously pursue admission of J's statements under any rule other than Mil.R.Evid. 803(4). The military judge made no findings of fact concerning the foundational requirements of either Mil.R.Evid 803(24) or 804(b)(5). Nor did his findings address the "particularized guarantees of trustworthiness" required before "residual hearsay"—which is not a "firmly rooted" hearsay exception—may be admitted consistent with the Confrontation Clause. *See Idaho v. Wright; United States v. Lyons*, 36 M.J. 183, 186 (C.M.A.1992); *Ureta*, 41 M.J. at 577. If the convening authority directs a rehearing on the sodomy and rape charges, the prosecution may attempt to introduce J's statements to Ms. Clifton as "residual hearsay," or under another hearsay exception which may be applicable.

## V. REMAINING ISSUES AND DECISION

Appellant argues the evidence is factually insufficient to support his convictions for assault consummated by battery of V and L. We disagree. The evidence persuades us beyond a reasonable doubt that the appellant is guilty of these offenses. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987).

We affirm the findings of guilty to specifications 1 and 2 of Charge I, and Charge I (assault consummated by battery). We set aside the findings of guilty to the specification of Charge II and Charge II (sodomy), and the specification of Charge III and Charge III (rape). We set aside the sentence. The convening authority may direct a rehearing on the alleged sodomy and rape. If the convening authority does not direct a rehearing on either of these two alleged offenses, the convening authority will direct a rehearing on the sentence only. *See United States v. Peoples*, 29 M.J. 426 (C.M.A.1990); *United States v. Diaz*, 39 M.J. 1114, 1119 (A.F.C.M.R.1994).

Senior Judge HEIMBURG, and Judges PEARSON, SCHREIER, and GAMBOA concur.

DIXON, Chief Judge (dissenting in part and concurring in part):

I cannot agree that the military judge abused his discretion in admitting the statements of Ms. Clifton, a child therapist, under Mil.R.Evid. 803(4). In my view, there was a factual basis for the military judge to infer that J made the statements to Ms. Clifton with an expectation of promoting her well-being. *United States v. Quigley*, 40 M.J. 64 (C.M.A.1994). The military judge was aware that J had multiple therapy sessions with Ms. Clifton. During these sessions, J progressed from a frightened, troubled little girl who was very "hyper vigilant" to someone who was later described as one who "enjoys therapy," "did not want to leave therapy," "asks to come to therapy" and "cries when time to leave therapy." This remarkable progression convinces me J clearly expected to promote her well-being during her visits with Ms. Clifton. I submit the military judge's ruling was consistent with those cases which hold there may be some relaxing of the quan-

11.  10 U.S.C. § 859(a) (1994).

tum of proof necessary to admit statements under the "medical exception" when small children are being treated. *United States v. Williamson*, 26 M.J. 115 (C.M.A.1988); *United States v. Lingle*, 27 M.J. 704 (A.F.C.M.R. 1988).

I cannot concur with the majority's conclusion that to admit these statements under the "medical exception" would relax the standard "to such a degree that there is no standard at all." Here, there is considerable evidence from which the military judge could infer that J had an expectation of benefit from interacting with her therapist. In addition to the documented evidence of changes in J's attitude during the sessions, Ms. Clifton testified she told J during their initial session "we're here to talk about your feelings and to help you." There is evidence that J had previously received medical treatment, there was testimony that Ms. Clifton had been addressed as "doctor" by J's mother while J was present, and there are clear indications that, as the therapy sessions progressed, J viewed Ms. Clifton as someone she could trust.

In my opinion, the real question here is not whether the military judge abused his discretion (by being clearly erroneous) but rather whether *this Court is satisfied* that the factual requirements of the "medical exception" have been met. Whether there is sufficient evidence to establish the existence of an actual expectation of receiving medical treatment on the part of an out-of-court declarant is a factual determination. *Quigley* at 66. I have no doubt that a majority of this Court may reverse a military judge on this factual determination. Article 66(c), UCMJ. My concern is, that in doing so here, we may appear to be departing from precedent which requires only a minimal showing of expectation of benefit when children are being treated. *See, United States v. Edens*, 31 M.J. 267 (C.M.A.1990); *United States v. Dean*, 31 M.J. 196 (C.M.A.1990); *United States v. Ureta*, 41 M.J. 571 (A.F.Ct.Crim.App.1994).

Senior Judges SNYDER, RAICHLE, and YOUNG did not participate.