UNITED STATES, Appellant

v.

James G. SIROKY, Staff Sergeant
U.S. Air Force, Appellee.

No. 95–5004.
Crim. App. No. 30646.

U.S. Court of Appeals for
the Armed Forces.

Argued Feb. 28, 1996.

Decided Sept. 5, 1996.

For the Accused: *Captain Kevin P. Koehler* (argued); *Colonel Jay L. Cohen* and *Captain Eric N. Eklund* (on brief).

For the United States: *Colonel Jeffery T. Infelise* (argued); *Colonel Thomas E. Schlegel* (on brief); *Lieutenant Colonel Michael J. Breslin.*

*Opinion of the Court*

CRAWFORD, Judge:

In February 1993, contrary to his pleas, the accused was convicted of rape and sod-

omy of his infant daughter and of assault consummated by a battery on his wife and stepson (one specification each), in violation of Articles 120, 125, and 128, Uniform Code of Military Justice, 10 USC §§ 920, 925, and 928, respectively. The convening authority approved the sentence of a dishonorable discharge, 5 years' confinement, and reduction to E–3. The Court of Criminal Appeals set aside the rape and sodomy convictions and the sentence because of improper admission of a statement to a psychotherapist. 42 MJ 707, 714 (1995) The Acting Judge Advocate General certified the following issue for our review:

> WHETHER THE AIR FORCE COURT OF CRIMINAL APPEALS ERRED IN HOLDING THAT THE MILITARY JUDGE ABUSED HIS DISCRETION IN ALLOWING A PSYCHOTHERAPIST TO TESTIFY, PURSUANT TO MIL. R.EVID. 803(4), ABOUT STATEMENTS THE VICTIM MADE TO HER DURING THERAPY.

We hold that there was clear error by the military judge, because the record contains no evidence that the declarant had an expectation that her statement on July 24, 1992, concerning the accused was pertinent to her treatment by the psychotherapist.

## FACTS

The accused, Staff Sergeant Siroky, met Violeta, the victim's mother, in July 1987, while she was working as a cashier at a bar in the Philippines. Within several years after starting to live together, they were married. This was not a smooth marriage.

Witnesses who knew the Sirokys in the Philippines, Staff Sergeant David Dance and his wife, Maria, described arguments between the two and Siroky's wife's desire for money. She would take the accused's property and sell it on the black market. If the accused would not give her the money she requested, she would threaten to go to his First Sergeant. When he did give her money to buy food, she found other purposes for the money, and the accused finally resorted to giving the money to Mrs. Dance to ensure that food was in fact purchased.

The accused's wife would threaten him while she was pregnant that she would get an abortion if he did not give her money. She also threatened "to have the baby adopted" by someone else if he did "not marry her." The wife was described by various individuals as being dishonest, manipulative, and emotionally abusive to the accused.

As a result of the eruption of Mount Pinatubo, the Sirokys, like many other Air Force families, were forced to leave the Philippines. They moved to Patrick Air Force Base, Florida. However, Violeta did not want to move to the United States but wished to remain in the Philippines. She testified that, following the move, the accused began to drink heavily and became physically abusive. To counteract this, she asked him to send her back to the Philippines. She also made it clear that if she left, she would take J, their daughter, with her.

The dispute between the accused and his wife finally came to a head in December 1991. On December 3, 1991, she went to Social Actions and saw Sergeant Kempf. He referred her to the base hospital and to the Air Force Office of Special Investigations. On December 6, 1991, J, who was 29 months old, was examined by Dr. Donald Arnold. Doctor Arnold's examinations did not find abrasions, hymenal tears, lacerations, scars, skin tags, clefts or notches in the hymen. Additionally, there was no roughing of the hymen, and the hymen was not extended in any way. In fact the only basis for his opinion that "J had vaginal penetration on multiple occasions" was the horizontal distance of the central hymenal perforation. However, on cross-examination he admitted that this was not unusual.

On that same day the accused was ordered to stay away from the house, and his wife went on a spending spree. In effect, she "sold everything in the house" and went to live with her sister and brother-in-law in South Carolina.

Because J was not able to express herself to the doctor, Doctor Arnold was dependent on Violeta as the sole source of information.

Violeta told Agent Gatti that four times she had seen what she thought was a pubic hair in [J]'s diaper. She said that, on several of these occasions, the diaper had contained "white sticky stuff" which was "shiny and slippery." Violeta referred to this as semen.

To support her allegation, Violeta gave a diaper with pubic hair in it to Special Agent Gatti. Further examination showed that the hair was from an African American, rather than a Caucasian, the accused's race. Violeta was Asian. Additionally, Violeta did not tell the doctor or the agent that what she saw was really not semen but a discharge from a vaginal infection. The discharge from J was noticed by her neighbor, Mrs. Aguirre.

After the accused was separated from his family, his wife filed for a divorce and sought custody of J. Mrs. Ella Page, her attorney, referred her to Ms. Lindy Clifton, a psychotherapist, for "abuse specific therapy." Ms. Clifton was not asked "to determine whether this child was sexually abused" but, instead, was "asked specifically to provide ... help" for J because she had "already been diagnosed as a victim of sexual abuse." Her testimony forms the basis of this appeal. Ms. Clifton acknowledged that she had furnished an affidavit to the divorce attorney.

Ms. Clifton first saw J on May 4, 1992. She described her first session as follows:

Q. Okay. Now, when you initially saw [J] on the 4th of May, go over with me again, please, Ms. Clifton, exactly how you initially introduced yourself to her, if you can recall. Did you—

A. I can't—Your Honor, I can't—

Q. —tell her your name or not?

A. —I can't give you word, you know, word for word. Generally, what I do with children, when they're waiting in the waiting room, I come out with a puppet or a toy. I introduce myself to the child. Children call me "Miss Lindy." I will shake their hand and say, "I'm Miss Lindy. Would you like to meet my puppet, Mr. Duck" and we'll sit and pet Mr. Duck for a minute. I'll talk with the parents, then I will ask the child if they would like to go

back and see what toys I have. Once we're back there and in front of the parent, I will talk about myself as being a helper. With older children, I will talk about—if it's through the—if it's a legal case, that I am there as their protector to talk to them for the court.

Q. That wasn't in this case.

A. That wasn't in this case.

Q. No.

A. Okay. I'm off the subject.

Q. But you would typically—

A. The child knew my name, that I was Miss Lindy, that we were going to go back and look at toys. On that first session I talk about that we're here to talk about your feelings and to help you.

Q. Now, you indicated, I think, Ms. Clifton, that initially that [J] was reasonably unresponsive to your efforts.

A. Yes, Sir.

Earlier in her direct examination on the motion *in limine* to suppress her testimony, Ms. Clifton elaborated on J's behavior at their first session, as follows:

[J] had a lot of difficulty coming back to the play room. She presented as extremely anxious. She was hyper vigilant, surveying the environment to see what was going on. She was non-verbal. She stood in the corner. She was not willing to interact with any of the toys that I had provided for her.

\*   \*   \*

Q. When you first met [J], how did you introduce yourself to her, and why she was there?

A. When children come into my office— we have a waiting room—and particularly with very young children and wanting to bond as quickly as possible with that child, I will come out into the waiting room and sit on the sofa, bring a toy or bring a puppet, and ask that child if they would like to go back and see my toys. I will let them know

that I am an adult who is there to help, and that we're going to be talking about our feelings.

On cross-examination, defense counsel asked:

Q. Ms. Clifton, was [J] at all aware that you were there to assist her or help her, treat her?

A. [J]'s family and mother, after our first session, she would refer to me as "the lady" or "the doctor." And, of course, professionally and ethically, when that would happen, I would need to clarify that I am not a doctor, that I am a therapist. In this child's mind, I am a helper. With older children, I will identify myself as a counselor, and if they're in school, then they understand that terminology. To identify myself as a counselor with a 2½ or 3 year old would not be applicable. They would not understand that.

Q. Okay. And in this case she did not understand that.

A. A 2½ to 3 year old child would have no understanding of what the word "counselor" you know, would be. They would certainly understand that we're here to have fun with the toys. We're here to learn about our feelings and to help you take care of yourself, that type of thing.

Over succeeding sessions, however, Ms. Clifton described the development of a close and trusting relationship with J:

Q. ... And as your sessions with her progressed, she then became more responsive, is that true?

A. Yes, Sir. She became bonded with me.

[M]eaning that we were developing a relationship, that she saw me as her advocate, that she enjoyed coming to therapy, that she was responsive to my questions and what I would ask her to do, that she felt unconditional positive regard for herself in my office, that it was a friendly and safe place.

Q. And then as she progressed, I think you testified that it reached the point where [J] would permit you to hold her and rock her in your arms.

A. Yes, Sir.

Ms. Clifton testified that she saw the child nearly every week from May 4, 1992, until the date of trial. She "would have liked to have seen this child twice a week." According to Ms. Clifton, J did not start verbalizing and demonstrating sexual abuse by appellant until July 24, 1992. Ms. Clifton described this date as "significantly into my therapy with this child."

The key evidence the prosecution sought to introduce through Ms. Clifton was her opinion that J's behavior was "consistent with what you have seen in other [abused] children." Additionally, the Government sought admission of the statements J made on July 24, 1992, as to appellant's sexual abuse.

Pertinent to the hearsay issue, the military judge entered the following findings of fact:

Mrs. Clifton initially saw [J] and her mother on the 20th [sic] of May 1992, took a history of alleged abuse from the mother, and started therapy on [J].... Initially, [J] was verbally unresponsive to Ms. Clifton, but she observed the child "humping" furniture and exhibiting masturbatory behavior....

Initially, on 20 [sic] May 1992, Ms. Clifton introduced herself to [J] as "Ms. Lindy" and indicated that they were together to talk about [J]'s feelings and to help her. Although the child was initially unresponsive, including curling up into a fetal ball, if you will, the child subsequently opened up—again, my words—became bonded—Ms. Clifton's testimony—and referred to Ms. Clifton on occasion as Doctor, indicated she enjoyed their sessions, her relationship with Ms. Clifton progressing to the point where she—[J]—would permit Ms. Clifton to hold her in her arms and rock her....

The court below commented:

The military judge made no express finding that J had an expectation of promoting her well-being by talking to Ms.

Clifton. In response to the defense argument that the evidence did not show J had such an expectation, the military judge simply said "... I rule to the contrary" without elaboration.

42 MJ at 710.

The Government argues that Ms. Clifton was to render medical assistance. She testified she was referred by the wife's attorney because the child "was having severe symptoms ... and wanted me to see the child and to start psychotherapy with her." The Government also argues that on at least two occasions the child knew that Ms. Clifton was there to help; that the child referred to Ms. Clifton as "doctor"; and that the treatment was working because she "bonded" with the child. Final Brief at 5.

The defense argues that Ms. Clifton started with a false premise of abuse based on the information provided by the wife. They argue that the reason for referral was not because of any possible abuse but because of pinworms. They argue that pinworms and vaginitis, and not sexual abuse, caused the victim's response. Answer to Final Brief at 23.

The defense also argues that there is a possibility of misinterpretation by Ms. Clifton because of "post-event contamination" due to miscommunication with such a young child. Answer at 25.

The defense further argues that the expectation-of-treatment prong of the medical-treatment hearsay exception has not been established. Answer at 36. We note that the judge made no specific findings on this prong but did seem to rule that the offered evidence satisfied this prong.

## DISCUSSION

This Court has condensed the language from Mil.R.Evid. 803(4), Manual for Courts–Martial, United States, 1984, into two foundational elements, as follows:

First, the declarant must have "some expectation of promoting his well-being and thus an incentive to be truthful." Second, the statements must be made by a declarant "for the purpose of [medical] diagnosis and treatment."

*United States v. Armstrong*, 36 MJ 311, 313 (CMA 1993) (citation omitted). We have also said:

The rationale for Mil.R.Evid. 803(4) is the self-interested motivation to speak the truth to a treating physician or an individual in the mental health field in order to receive proper care and the necessity of the statement for a diagnosis or treatment.

*United States v. Quigley*, 35 MJ 345, 347 (CMA 1992).

■ An important question at the outset of this appeal is: What is the standard of review regarding that expectation here—and to whose decision do we apply the standard?

In *United States v. Quigley* (*Quigley* II), 40 MJ 64, 66 (CMA 1994), a unanimous Court held that "determinations by a military judge and a Court of Military Review [now Court of Criminal Appeals] of the existence of an actual expectation of receiving medical treatment on the part of the out-of-court declarant ... present a preliminary question of fact.... As such, their findings of fact will be set aside only if clearly erroneous."[1] (Citations omitted.) This would seem unambiguous as to the standard (clearly erroneous), but it does leave somewhat cloudy whose

1. Lest it might seem that it tilts with windmills to quarrel whether something is a question of fact reviewable for clear error, a question of law reviewable *de novo*, a mixed question, and so forth, we note the following view found in Davis, *A Basic Guide to Standards of Judicial Review*, 33 S.Dak.L.Rev. 468, 472–73 (1988):

On questions of fact, the reviewing court usually asks whether the decision is *reasonable*. On questions of law, it asks whether the decision is *correct*. On discretionary decisions, it usually asks whether the decision is *legal* in the sense of being within the prescribed boundaries which define the area of discretion. Thus, the decision whether the issue is fact, law, mixed, or discretionary can be decisive on appeal.

*See also id.* at 468 (chart); O'Neill and Brody, *Taking Standards of Appellate Review Seriously: A Proposal to Amend Rule 341*, 83 Ill.Bar.J. 512, 516 (Oct.1995) (chart entitled, "Appellate Court Deference to Trial Court Rulings," reflecting a continuum of deference to trial court decisions based upon the kind of question and the standard of review).

decision this Court reviews—the military judge's or the lower appellate court's. The appellate court in *Quigley II* had agreed with the military judge, and this Court seemed to review both in tandem. In *United States v. Faciane*, 40 MJ 399, 403 (CMA 1994), and more recently in *United States v. Ureta*, 44 MJ 290, 298 (1996), this Court did not expressly address this latter concern; in fact, however, in each case we proceeded directly to review the military judge's ruling.

In this regard, Martha S. Davis, coauthor of a work often cited by this Court regarding standards of review—S. Childress and M. Davis, *Federal Standards of Review* (2d ed. 1992)—has written elsewhere as follows:

> The question often arises how a second-level appellate court, such as the United States Supreme Court, reviews an intermediate appellate review of a trial court or agency decision. The short answer is, it's difficult to determine. On the one hand, the Supreme Court has said on several occasions that its review function as to Circuit Courts of Appeals decisions is limited to the correction of gross errors in application of the standard of review by the Court of Appeals. What the Supreme Court seems most often to do however is to go through the Court of Appeals decision in order to re-review the trial court or agency decision and determine from that whether the Court of Appeals review was right or wrong. In other words, the Supreme Court appears to fully substitute its judgment for that of the Court of Appeals. In a way, however, this makes sense because application of the standard of review is a pure question of law. Thus, logically, the Supreme Court could be *sub-silencio* applying de novo review to the pure law question of application of the standard of review, making full substitution of judgment appropriate.

Davis, *A Basic Guide to Standards of Judicial Review*, 33 S.Dak.L.Rev. 468, 482–83 (1988) (footnote omitted).

Professor Davis' observations aptly describe what this Court has done when reviewing a patient's expectations of medical help as a preliminary fact question in order to determine admissibility of the patient's out-of-court statements that the proponent claims were made in pursuit of that help. That is, when determining the correctness of the decision of the now-Court of Criminal Appeals, we typically have pierced through that intermediate level and have examined the military judge's ruling for clear error; then, on the basis of that examination, we have decided whether the Court of Criminal Appeals was right or wrong in its own examination for clear error.[2] We will follow the same path here.

Accordingly, simply stated—and regardless of the wording of the certified issue—the appropriate inquiry here for this Court is: Was the military judge's finding as a preliminary fact that J had held an expectation of medical treatment when she had made her statements to Ms. Clifton clearly erroneous?

■ As to the expectation of J, Ms. Clifton testified that a "2½ to 3–year–old child would have no understanding of what the word 'counselor' you know, would be." It is clear that children of that age are not expected to seek out medical treatment independently, but instead rely upon their caretakers to obtain treatment when necessary.

This case is very close to *Faciane*, where this Court held that the military judge erred in admitting the statement made to Mrs. Cheryl Thornton, a member of the Child Protective Committee at Children's Memorial Hospital, Oklahoma City. Mrs. Deitchman, the victim's mother, "told the child that they were going to the hospital 'to see an [sic] doctor and talk to a lady,' and the child knew that she was in a hospital when she talked to Mrs. Thornton." Judge Gierke wrote:

> We hold that the evidence is insufficient to establish the second prong [expectation of treatment] for admissibility. Although the child may have associated a hospital with treatment and may have known that

---

2. It is this type of review that the author must have had in mind when he defined "appeal" as: "In law, to put the dice into the box for another throw." Ambrose Bierce, *The Devil's Dictionary* (1906), quoted in D. Shrager and E. Frost, *The Quotable Lawyer* 11 (1986).

she was in a hospital when she talked with Mrs. Thornton, there is no evidence indicating that the child knew that her conversation "with a lady" in play-room surroundings was in any way related to medical diagnosis or treatment. Mrs. Thornton testified that she *did not present herself* as a *doctor or do anything medical*. There is no evidence that Mrs. Thornton was *dressed* or otherwise identified as a medical professional. The interview took place in a room filled with toys. There is *nothing* suggesting that the child made the statements with the expectation that if she would be truthful, she would be helped.

40 MJ at 403 (emphasis added).

In *United States v. Morgan*, 40 MJ 405 (1994), this Court held that statements made by a 13–year–old to civilian social workers were admissible under the medical-treatment exception. The military judge there had made specific findings of fact that the child was seeking emotional counseling, *citing United States v. Clark*, 35 MJ 98, 105 (CMA 1992). In *United States v. Quigley*, 40 MJ 64 (1994), this Court affirmed appellant's conviction for child abuse. We held that a very young child may not have the same understanding or incentive as adults for making statements to medical care providers. Then–Chief Judge Sullivan concluded that there was no error, even though it was not entirely clear on the record as to the child's expectation of receiving treatment, because of the fact that the child "testified that she went to Dr. Calhoun to get 'help.' " *Id.* at 66.

In *United States v. Armstrong*, 36 MJ 311, 313–14 (1993), this Court held that statements made by the child one year after she was referred to a clinical psychologist were not admissible. Then–Judge Cox stated:

First, the statements were made by the victim to trial counsel in preparation for trial [also the clinical psychologist was present], not by the victim to a doctor, physician, or other medical person, to describe "medical history, or past or present symptoms, pain, or sensation." The fact that they were repeated again some days later does not change the character of the statements. Further, it cannot be fairly stated, given the circumstances surrounding these declarations, that this child made the statements in anticipation of being healed or cured of a disease or medical problem.

(Citation omitted.) The Supreme Court in *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), interpreted Fed.R.Evid. 804(b)(3) as requiring the trial judge to admit only those declarations in a narrative which are individually self-inculpatory for the defendant. Recognizing the hazards surrounding hearsay statements, the Court remanded the case for a "fact-intensive inquiry" to ensure that the rationale behind the reliability of declarations against interest are met. *Id.* at 114 S.Ct. at 2437.

■ The rationale behind *Williamson*—ensuring the reliability of out-of-court statements—can apply equally to the medical-treatment hearsay exception. When looking at a narrative, the trial judge must ensure that before each segment of a statement is admitted, it fits both the necessary criteria: that the declarant made the statement with some awareness that it was pertinent to his or her treatment and that the statement was actually for the purposes of treatment or diagnosis. If the statement does not fit both of these prongs, it must be excluded. That analysis was not done here.

Even if there was clearly sufficient evidence to meet the requirement that the statements were made for the purposes of treatment, there is simply insufficient evidence in the record to support the expectation-of-treatment prong. As this prong focuses on the declarant's state of mind, we recognize that a small child may not be able to articulate that he or she expects some benefit from treatment. Thus, it is often important for their caretakers to explain to them the importance of the treatment in terms that are understandable to the child. *United States v. Avila*, 27 MJ 62, 66 (CMA 1988) ("Obviously, very young children will not have the same understanding or incentive as adults when making statements to persons providing health care."). Not only did J not

testify in this trial, but also there is no evidence on the record that her mother explained the importance of treatment to J. Specifically, the record does not give us any indication that the statements made by J concerning her father on July 24, 1992, were believed by her to be pertinent to treatment. Further, as in *Faciane*, there is insufficient evidence for us to draw the inference that J must have known that any statement she made would help her in treatment. Ms. Clifton did not present herself as a doctor and did not engage in any activity which J could have construed as treatment. Further, the interviews with J were conducted in a room filled with toys.

We agree with the court below that the evidence of record is insufficient to show that J's statements qualify under the medical exception to the hearsay rule. We therefore answer the certified question in the negative. We are satisfied that the court below correctly held that this error was prejudicial.

The decision of the United States Air Force Court of Criminal Appeals on reconsideration setting aside the rape and sodomy convictions and the sentence is affirmed.

Chief Judge COX and Senior Judge EVERETT concur.

GIERKE, Judge (concurring in part and in the result):

I agree with the result and most of the rationale of the majority opinion. I write separately to comment on the standard of review articulated by the majority. 44 MJ at 398–399. I agree that in most cases we must pierce the Court of Criminal Appeals' decision and examine the military judge's ruling, but I am concerned with the majority's apparent lack of deference to the court below where it has exercised its independent fact-finding power.

Unlike an intermediate appellate court in the civilian judicial system, the Court of Criminal Appeals has unique powers under Article 66(c), Uniform Code of Military Justice, 10 USC § 866(c), to engage in independent factfinding. *United States v. Jones*, 39 MJ 315, 318 (CMA 1994) (lower court did not abuse discretion by not reducing sentence

upon reassessment); *United States v. Johanns*, 20 MJ 155, 160 (CMA 1985) (deferring to lower court's factual determination "that no custom of that service prohibited" accused's conduct); *see also United States v. Manuel*, 43 MJ 282, 289 (1995) (lower court did not abuse discretion by suppressing evidence to remedy Government's loss of urine sample).

The Court of Criminal Appeals observed that "the military judge made no express findings of fact concerning J's expectation" of "promoting her well-being." The court then held that "[t]o the extent [the military judge] may have intended his 'I rule to the contrary' comment to be such a finding, it is clearly erroneous." 42 MJ 707, 713 (1995).

Unlike *United States v. Faciane*, 40 MJ 399 (CMA 1994), and *United States v. Ureta*, 44 MJ 290 (1996), cited by the majority, 44 MJ at 399, this case is before us on certification from the Acting Judge Advocate General, not a petition for review. The certified question asks whether the Court of Criminal Appeals erred when it overruled the military judge based on its independent finding of a preliminary question of fact not specifically addressed by the military judge. In this appellate posture, we should look at the decision of the Court of Criminal Appeals and ask if its decision is clearly erroneous. I am satisfied that the decision of the Court of Criminal Appeals was not clearly erroneous; thus I join the majority in answering the certified question in the negative.

SULLIVAN, Judge (concurring in the result):

The Court of Criminal Appeals held that "the evidence is insufficient to show J made her statements with an expectation of promoting her well being." It went on to hold: "As noted above, the military judge made no express findings of fact concerning J's expectation. To the extent he may have intended his 'I rule to the contrary' comment to be such a finding, it is clearly erroneous." 42 MJ 707, 713 (1995). These holdings in my view are not synonymous; they are distinct

holdings, either one being legally sufficient to resolve this case.

The majority opinion blurs the distinction between a military judge's ruling that is erroneous because it is based on insufficient evidence of record (*see United States v. Faciane*, 40 MJ 399, 403 (CMA 1994)) and one that is supported by evidence in the record but is "clearly erroneous." *See United States v. Quigley*, 40 MJ 64, 66 (CMA 1994). In my view the Court of Criminal Appeals reached alternative holdings in this case and I agree with this approach. *Cf. United States v. Morgan*, 40 MJ 405, 409 (CMA 1994) (Court not prepared to hold military judge's findings of fact were unsupported by evidence or clearly erroneous). Accordingly, I concur in the result.