**UNITED STATES**

v.

**Technical Sergeant Terry H. COX, FR424–82–2509, United States Air Force.**

**ACM 30712.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 23 March 1993.

Decided 9 May 1995.

Appellate Counsel for Appellant: Mr. Vaughan E. Taylor, Esq. (argued), Colonel Jay L. Cohen, Lieutenant Colonel Frank J. Spinner, Captain Joel R. Reifman, and Captain Michael L. McIntyre.

Appellate Counsel for the United States: Captain R. Scott Howard (argued), Colonel Jeffery T. Infelise, Colonel Thomas E. Schlegel, Major Jules D. Silberberg, and Major John H. Kongable.

Before HEIMBURG, RAICHLE, and BECKER, Appellate Military Judges.

## OPINION OF THE COURT

HEIMBURG, Senior Judge.

A general court-martial, sitting with members, convicted Technical Sergeant Cox of rape, two specifications of sodomy, and five specifications of indecent acts or liberties with a child, in violation of Articles 120, 125, and 134, UCMJ, 10 U.S.C. §§ 920, 925, and 934 (1988). His approved sentence is a dishonorable discharge, confinement for 14 years, and reduction to E–1. Among the six errors he has assigned are assertions that the military judge erred by permitting a great deal of unreliable hearsay testimony, not made for purposes of medical diagnosis or treatment. We find no error, and affirm.

## I. BACKGROUND

The appellant and his wife married in 1983, and their two daughters ("K" and "C") were born in 1985 and 1988. The rape, sodomies, and all but one of the indecent acts or liberties specifications involved K, while C was the victim of one specification of indecent acts with a child.

The allegations came to light when K and C were playing at a friend's house on 25 July 1992. The friend's mother, Mrs. P, came upon a closed bedroom door and opened it, startling her daughter and K, who were grappling around on the bed. Questioning the girls separately, Mrs. P found they had

been "French kissing," as K had seen people do in some movies her mother "threw away." K, who was then 6 years old, was initially "frightened" at being questioned, Mrs. P said, but then became very upset, saying "her daddy told her he would beat her with the belt—her mother would beat her with the belt if she told her mother, that she would be mad." Mrs. P consoled K, and let the girls go outside to play. Twice thereafter, K returned into the house, crying, to ask Mrs. P not to tell her mommy. When Mrs. Cox called, Mrs. P reported what she saw and heard. Confronted about the incident, K said she learned her "gross" behavior from movies her daddy made her watch. When they watched the movies, she said, her daddy would "try to do what was in the movies to me." K related sodomy, intercourse, and indecent acts her daddy performed. Mrs. Cox testified she at first did not believe K's allegations, but K was adamant they were true, even confronting the appellant that afternoon and asking him why he was lying by denying them. After 5 days, Mrs. Cox reported the allegations, and K was questioned by investigators first on 31 July 1992.

K testified that she and her friend were caught playing "gross," and that she learned such behavior from some movies her dad showed her. In those movies, "the boy was putting his penis inside the girl's vagina" and "was licking the girl's vagina and the girl was licking the boy's penis." She watched the movies lots of times when her mommy was "either shopping or at work or somewhere" and her little sister, C, was "[e]ither taking a nap or playing down in her room." While they watched the movies, her dad would "try to do what was in the movies to me." He put his penis into her vagina, but it only went in "a little." (Showed about ¼ inch with fingers.) When he did, it hurt "[a] lot." When she told him to stop, he would "just go on" and say "just a few more minutes." Sometimes he tried to put his penis in her "bottom" (pointing and saying "[i]n the back.") "That hurt." He put "jelly stuff" on to make his penis go inside. It was "slick" and "clear" and came in a container that was "like round sort of" and had a top "[y]ou could pop" off. She showed the Air Force Office of Special Investigations (AFOSI) in-

vestigator where the container was kept, down in her mom and dad's bathroom. She identified Prosecution Exhibit 1 as the container: it is a jar of petroleum jelly.

K said her dad put "[m]akeup eyeliner pencil caps" in her vagina. They were kept in her mom and dad's bathroom also, "in her makeup basket." K showed how her dad would take the cap off and "put a little bit of jelly on it to make it go in." He put all except the last ¼ to ⅜ inch of the caps in. He also put his "pinky and his pointer finger" inside her vagina. Her dad also "wanted me to lick his penis." She did—"I was little back then." Her dad would put some "chocolate syrup, maybe a ring lollipop, you know, that has that hoop on it" on his penis to get her to do it. "It made me gag." He also "would lick my vagina" a lot. Out of her dad's penis would come this "white gooey stuff." She would have no clothes on, because her dad always took them off and they were on the floor. He would lie her on a towel on the bed. He said "if anything got on the bed it wouldn't be because the towel would be there." When the "white gooey stuff" came out of her dad's penis, it went "[o]nto my stomach." He would then clean it up with a wash cloth, she would put her clothes back on and go and play. Where did these things happen? "It would either be in the bathroom upstairs, the bathroom downstairs which is my mom and dad's bathroom, or in my mom and dad's room, or upstairs on the couch." They watched the movies "[e]ither on the bed or the couch" downstairs. After he was done, he would put medicine on her—she identified a tube of Terazol 7 vaginal cream as what he used—and tell her it was so "if I went potty it wouldn't hurt." (Other witnesses identified Terazol 7 as a cream used to combat yeast infection in women.) K said she didn't tell anyone because "my dad told me if I told my mom I would get a spanking with the belt." She testified that, as a result of the threat, "I didn't tell until I got caught with [her friend]."

C did not testify at trial, and the primary testimony concerning this specification came from Mrs. Cox. When K's allegations came up, Mrs. Cox and the investigators ques-

tioned C, but C denied that her dad touched her in any bad way. Nevertheless, questions about possible sexual abuse lingered, partly because of C's behavior. In October 1992, a pediatrician examined C and said she was "suspicious" of sexual abuse because of her observations of the child's hymen. While she admitted nothing in her observations was necessarily indicative of sexual abuse, she relayed her suspicions to Mrs. Cox, who then took C to the therapist who had been seeing her daughter K.

That therapist was Kathy Hunter, a former school teacher and guidance counselor. Ms. Hunter had a master's degree in counseling and guidance and several years of experience in working with children on various behavioral problems, including "school problems, problems within the family setting, [and] sexual abuse issues." In addition to practical experience, Ms. Hunter had attended seminars, workshops, and had done a considerable amount of reading on the subject of child sexual abuse. She was qualified, without objection, as an expert in "treatment of sexually abused children."

Ms. Hunter testified C would come up to her and say, "We're just not going to talk about the truth." When Ms. Hunter pressed her about what she meant, C would say, "Well, I don't want to talk about it. It makes me sad." On one occasion, C told Ms. Hunter "her daddy had asked her to take off her pants and then he had spanked her bottom." Asked what she meant by "spanked her bottom," C pointed to her vaginal area and to her buttocks area and "said, 'My daddy spanked me on my bottom, and then he went and washed his hands, and then he told me to get my nightgown on.'" C was 3 years old at that time.

Mrs. Cox testified that, shortly before the Article 32, UCMJ, 10 U.S.C. § 832, hearing in this case, Major T, the base chief of military justice, came to her house to talk with C one more time to determine what, if any, charge her testimony would support. He brought the eyeliner pencils K had previously identified that her dad used. When C saw the pencils, she started crying and withdrew, putting her fingers in her mouth. She refused to look at the pencils. Mrs. Cox

calmed C and asked her if her bunny "Bea" could "help her talk about it." C agreed, picked up "Bea," picked out one pencil, and put it between the bunny's legs, saying that's what her daddy did. There was no objection to this testimony at trial.

The appellant denied all charges. He testified he never pulled down either girl's pants to spank her, but did spank C on her bare bottom when she wouldn't want to wear the nightgown that was laid out for her. He said one time, when C was about 2 years old, he was bathing with both girls when K reached out and grabbed him "in the groin area." He "pulled back from her and told her that it wasn't very nice." (Mrs. Cox testified this incident occurred much earlier, when K was 2.) He never allowed K to view his pornographic videotapes, but once she saw them on a shelf in his wardrobe and asked him about them. He testified he got rid of the videotapes "about a year" before trial. He denied ever sexually molesting either of his daughters. He said neither he nor his wife, to his knowledge, explained Terazol 7 to K, and he had no idea how she came up with her testimony about it. He claimed he used the petroleum jelly only to clean his guns and as lip balm.

Dr. Frank appeared as a defense expert in "investigative evaluations and in child sexual abuse evaluation and treatment as well as the field of human memory." He related the theories of memory and testified that "memory" can be implanted by the conditions of the interview. He told of the dangers of "contaminating" children's memories, especially when questioners are authority figures, such as police or OSI agents. He mentioned the close relationship K had with Major T, and how this relationship could have contaminated her memory. Although he said a child's first story is the most "pure," children may not tell everything the first time they talk because they are afraid of the reaction. He said that therapists, himself included, do not like to challenge stories, because it conflicts with their role as therapists. Nevertheless, unless an alleged victim's story is challenged, "it is a problem" because a therapist's continued acceptance of the story can encourage the teller to develop a false memo-

ry of abuse. Dr. Frank reviewed records, but did not speak with any of the victims. He conceded he learned that Mrs. Cox initially challenged K about her story for 5 days before Mrs. Cox reported the abuse, and that K revealed almost all of the abuse before the first time she met Major T.

## II. THE HEARSAY

Although the appellant asserts the findings are suspect because the evidence is riddled with unsupported hearsay, his attack can be reduced to two significant areas: hearsay admitted over defense objection under the "medical exception" and unobjected-to hearsay about C's statements.

### a. The Medical Exception

Mil.R.Evid. 803(4) permits the admission of hearsay statements "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The proponent of such statements must show both, that the statement was made for the purpose of medical diagnosis and treatment, and that the declarant made the statement with some expectation of receiving a "medical" benefit. *United States v. Faciane*, 40 M.J. 399, 403 (C.M.A.1994); *United States v. Armstrong*, 36 M.J. 311, 313 (C.M.A.1993); *United States v. Nelson*, 25 M.J. 110, 112 (C.M.A.1987), *cert. denied*, 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982 (1988). The appellant attacks both prongs of the foundation in his attack on the testimony from Ms. Hunter. He asserts Ms. Hunter did not provide any "medical treatment" as that term is used in Mil.R.Evid. 803(4), and that neither K nor C spoke with Ms. Hunter having any expectation of receiving any medical benefit.

The military judge found that the children were taken by their mother to "a therapist or a counselor" who "was going to help them with whatever problems they had." He also found that, based on their "many prior experiences with medical personnel ... they each did have some expectation of being helped by her, either to discuss their problems or at least to make them feel better about them-

selves." We will defer to the military judge's findings of fact unless clearly erroneous, and review his ruling admitting the hearsay for abuse of discretion. *United States v. Quigley*, 40 M.J. 64, 66 (C.M.A.1994); *United States v. Ureta*, 41 M.J. 571, 575 (A.F.Ct. Crim.App.1994).

We agree that Ms. Hunter's interviews of K and C were medically-related. The appellant makes much of the fact that Ms. Hunter's office was in an office building, and it had "toys ... and ... a big easel board to draw on." The fact that her office deliberately displayed none of the attributes of a hospital is no more dispositive of the first prong of the test than the fact that Ms. Hunter wore indistinctive, comfortable clothing. Rather, our focus must be on whether the statements were made for "medical" benefit. Statements may be given to a social worker or other non-physician health professional for such a purpose and be admissible under Mil.R.Evid. 803(4). *Faciane*, 40 M.J. at 403; *United States v. Williamson*, 26 M.J. 115, 118 (C.M.A.1988). Ms. Hunter was a trained counselor and therapist, the two girls were taken to her for help in overcoming the devastating effects of sexual abuse, and, in our view, that is sufficient "medical" help to meet the first prong of the test for Mil.R.Evid. 803(4).

The second prong focuses on the expectations of the children, but it "need not be based on the testimony of the child." *Quigley*, 40 M.J. at 66. Ms. Hunter testified she told K and C "this is your place" and she "was there to help." Taken alone, these statements do not show that K or C had any expectation of receiving medical benefit from talking with Ms. Hunter. Mrs. Cox testified, however, that she explained to the girls why they were going to see Ms. Hunter. She said she told K and C "we were going to go talk to somebody who could help us with what had happened to us ... that I didn't have the knowledge to be able to help her, to make her better, and that we needed help, and this counselor specialized in helping children who had had to go through things like this, and that she would be better at it and she would be able to help us."

652

The military judge's findings are fully supported by the evidence, and we adopt them. Based on the evidence, we find no abuse of discretion in admitting Ms. Hunter's testimony of hearsay statements. *Quigley,* 40 M.J. at 66.

### b. "Plain Error" Hearsay

■ As described above, the crucial hearsay testimony concerning the abuse of C was supplied, not by Ms. Hunter, but by Mrs. Cox. Ms. Hunter's testimony about C's comments and reactions support the general conclusion that C was sexually abused, but do not unambiguously support guilt as charged. One may conclude the words "spanked her bottom" mean that C was punished by her dad, but it is a more difficult leap of logic to take them to describe sexual abuse. On the other hand, Mrs. Cox's testimony about C's reaction to seeing the eyeliner pencils and C's actions with "Bea" the bunny clearly supported a finding of guilty. Appellant urges us to find that admission of this testimony, without defense objection, was plain error.

■ Hearsay is inadmissible, but may be considered by the court if admitted without objection, unless there is plain error. *United States v. Toro,* 37 M.J. 313, 316 (C.M.A.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 919, 127 L.Ed.2d 213 (1994); Mil. R.Evid. 103. Plain error is error that is clear or obvious and adversely affects substantial rights. *United States v. Olano,* —— U.S. ——, —— –——, 113 S.Ct. 1770, 1776–77, 123 L.Ed.2d 508 (1993); *United States v. Dudding,* 37 M.J. 429, 430 (C.M.A.1993); Mil. R.Evid. 103(d). In order to constitute plain error, the error must not only be both obvious and substantial, it must also have "had an unfair prejudicial impact on the jury's deliberations." *United States v. Fisher,* 21 M.J. 327, 328–29 (C.M.A.1986) (citing *United States v. Young,* 470 U.S. 1, 16–17 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1 (1985)).

■ The question of plain error often turns on defense trial strategy. If there is a defense strategy to allow the evidence, and admission does not affect a substantial right of the appellant, then there is no plain error. *Toro,* 37 M.J. at 317. At the outset of this case the trial defense counsel made a well-prepared, but unsuccessful, motion in limine to exclude Ms. Hunter's testimony. Later, however, he allowed Mrs. Cox to testify to blatant hearsay when she told how C placed the pencil in the bunny's crotch and said "that's what daddy did." The military judge did not question trial defense counsel on his reasons for allowing Mrs. Cox's hearsay testimony, so we are faced with the task of deciding whether its admission was part of a defense strategy or plain error.

We believe the record supplies ample evidence of a trial strategy which included allowing Mrs. Cox's hearsay testimony. Contrary to appellant's position on appeal, it was K's testimony, not Mrs. Cox's testimony about C's words, which was devastating to the defense. K's testimony, given in person and not through hearsay, was credible on its face and corroborated in significant details by the evidence found in the home. Mrs. Cox's testimony, on the other hand, played a minor role, since it affected only one specification of Charge III. The task for the defense was to undermine the credibility of K's testimony, which it attempted through the testimony of Dr. Frank. Dr. Frank testified that a questioner can easily and unknowingly influence a child's memory of events, even creating a "memory" of events which did not occur. The events in the home, with Major T present, supplied a good example for the defense to use in showing how interviewers may have so influenced the girls' testimony that they created false memories of sexual abuse by their father. Mrs. Cox testified that Major T showed C the eyeliner pencils. The defense counsel tried, on cross-examination, to show that he went even farther and suggested to C that she pick one of them. Even though Mrs. Cox (and later Major T) denied that such a suggestion was made, this line of testimony fit well into the framework of Dr. Frank's testimony about suggestive questioning, and supplied the defense with ammunition for closing argument.

We conclude that not objecting to the hearsay testimony of Mrs. Cox was clearly

part of a defense strategy to show contamination of the Cox girls' testimony, and that its admission did not affect a substantial right of the appellant. We conclude that its admission was, therefore, not plain error.

## III. TESTIMONY OF THE CHIEF OF MILITARY JUSTICE

■ Appellant asserts the military judge committed plain error in permitting the base chief of military justice, Major T, to testify that he had ascertained that the charges against appellant "had a legitimate basis." Major T was a rebuttal witness, called to testify that neither he nor Mrs. Cox suggested to C her allegation that her daddy used eyeliner pencil to commit indecent acts. Trial defense counsel's cross-examination challenged this assertion. He began by questioning Major T's reason for being in the home that evening, conducting an investigation, when C had, until then, denied any sexual abuse by her father. In response, Major T said:

> [B]ecause the previous day there was, for want of a better term, a breakthrough with respect to [a third girl] having identified a particular cosmetic eyeliner pencil. Time was in essence running short. The charges against the accused were scheduled to be preferred on Monday, the ... 9th of November of 92. Charges had to be drafted and typed up the previous workday, which would have been Friday, the 6th of November. That left us with Thursday ... as a last possible opportunity to find out if indeed there was a legitimate basis in fact to articulate a charge involving [C] against her father. Certainly I, as an attorney, as the Chief of Military Justice, have an ethical obligation to ascertain if there is a legitimate basis or not in fact to go forward with charges in a prosecutorial mode against someone.

Trial defense counsel continued to press the point that Major T was not a trained investigator and, thus, was not aware of proper questioning techniques to avoid contaminating a child's responses. During this interchange, Major T repeated his reasoning for going into the home that evening to question C, and denied suggesting any particular re-

sponse to her. Major T referred to his "ethical obligation" to be sure that there was a factual basis for charges, both for the protection of the accused and for the integrity of the military justice system. Appellant does not deny that Major T's statements were correct, but asserts that the military judge should have, sua sponte, kept these comments from the members or, at the least instructed the members to disregard them as expressions of personal belief in the appellant's guilt.

Again, we face a question of whether plain error crept into the trial. Unlike the hearsay issue, above, we can discern no tactical basis for trial defense counsel to permit the erroneous injection of opinion about evidence in front of the members. Also, once it came before the members, we fail to see a tactical reason for trial defense counsel not to request the military judge to instruct the members to disregard Major T's comments as an improper expression of personal opinion. That said, we are not convinced the erroneous admission of this testimony amounted to plain error. We are persuaded for two reasons. First, when examined in context, the error isn't as obvious as it now appears. Major T's remarks were limited by their context to the preferral of charges, not the ultimate decision on guilt. It seems self-evident that someone thought there was a basis for trial, or the members wouldn't be there, and that's all Major T testified to. Second, Major T's comments apparently had minimal impact on the members. Not only did none of the trial participants notice the problem, including the military judge, but the members proceeded to acquit the appellant of one of the specifications of indecent acts on a child. We find the erroneous admission of these remarks was not plain error.

## OTHER ISSUES

The appellant has raised four other issues. We will discuss some of them briefly.

■ Appellant asserts the military judge erred in denying a defense motion to find specification 7, Charge III, multiplicious with Charges I and II, and specifications 2, 5, and 6 of Charge III. We disagree. The military judge found that rape and sodomy were sep-

arate offenses from indecent acts or liberties with a child. This ruling was correct. *United States v. Teters*, 37 M.J. 370 (C.M.A.1993), *cert. denied,* ——— U.S. ———, 114 S.Ct. 919, 127 L.Ed.2d 213 (1994). *See United States v. Neblock,* 40 M.J. 747, 749–50 (A.F.C.M.R. 1994). He also found that the underlying facts for the various specifications of indecent acts with a child were not identical, thus eliminating any factual basis for multiplicity among them. *See Neblock,* 40 M.J. at 749. This finding was not clearly erroneous. *United States v. Burris,* 21 M.J. 140, 144 (C.M.A.1985), *United States v. Middleton,* 10 M.J. 123, 133 (C.M.A.1981). The military judge correctly ruled specification 7, Charge III, not multiplicious with any other specification.

 After the close of the prosecution's case, the court adjourned for one day to permit counsel to interview out-of-town witnesses. On the third day, trial defense counsel asked the military judge to permit individual voir dire of Lieutenant (Lt) C, the junior court member. Defense counsel asserted Lt C "had been noticed to have been visibly upset and crying during a portion of the testimony" from K. Defense counsel asked to question the member as to whether the crying indicated she had already "made up her mind" about guilt, and whether the testimony had, somehow, "triggered" a previously-repressed memory of sexual abuse she had not disclosed on initial voir dire. Neither the military judge nor counsel had seen the member cry, and there was no evidence she was demonstrative in her emotion, such as by sobbing. The military judge denied the motion, ruling that counsel's assertions were an insufficient basis to bring a member back for such questions.

The military judge's ruling will be tested for abuse of discretion. *United States v. Hamilton,* 41 M.J. 22 (C.M.A.1994), *cert. denied,* ——— U.S. ———, 115 S.Ct. 738, 130 L.Ed.2d 640 (1995). The military judge received a negative response from all the members to the question, "have you, any member of your family, any relative, or anyone close to you been a victim of either rape or sexual misconduct?" All members also assured the court they would wait until they heard all the evidence before deciding the case. A show of emotion by a court member, such as tears in the eyes, is not evidence that the member lied, or that the member cannot or will not maintain an open mind during trial. Much less is a show of emotion, by itself, evidence of some sort of "repressed memory" of sexual abuse. The military judge did not abuse his discretion in denying this request.

 In separate assignments of error, the appellant asserts that the evidence is factually insufficient to support findings of guilty, and that the sentence is too severe. We disagree with both assertions. As we previously noted, the testimony of K was clear, consistent, and credible. Moreover, it was corroborated significantly by the physical evidence she showed investigators at her home. Having carefully considered all the evidence, we are convinced of the appellant's guilt. Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1988). Moreover, we are convinced the appellant received the punishment he deserves, neither more nor less. *United States v. Healy,* 26 M.J. 394, 395–96 (C.M.A. 1988).

We conclude the findings and the sentence are correct in law and fact, the sentence is appropriate, and no error prejudicial to the substantial rights of the appellant was committed. Accordingly, the findings of guilty and the sentence are

AFFIRMED.

Senior Judge RAICHLE and Judge BECKER concur.