# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist NICHOLAS L. FROST**
**United States Army, Appellant**

ARMY 20160171

Headquarters, Fort Bliss
Michael J. Hargis, Military Judge (arraignment)
Lanny J. Acosta, Jr., Military Judge (trial)
Colonel Charles C. Poché, Staff Judge Advocate

For Appellant: Major Patrick J. Scudieri, JA; James S. Trieschmann, Jr., Esquire (on brief); Captain Steven J. Dray, JA; James S. Trieschmann, Jr., Esquire (on reply brief).

For Appellee: Colonel Tania M. Martin, JA; Lieutenant Colonel Eric K. Stafford, JA; Major Michael E. Korte, JA; Captain Jonathan S. Reiner, JA (on brief).

30 May 2018

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FEBBO, Judge:

Appellant was charged with the rape of a child under twelve for putting his penis in his daughter's mouth.[1] A military judge sitting as a general court-martial found appellant guilty of this offense and sentenced appellant to a dishonorable discharge, confinement for ten years, and reduction to the grade of E-1. The convening authority approved the adjudged sentence.

---

[1] Appellant was convicted of a single specification of rape of a child, in violation of Article 120b of the Uniform Code of Military Justice, 10 U.S.C. §§ 920 (2012) [UCMJ].

This case is before us for review pursuant to Article 66, UCMJ. Appellant brings four errors to our attention, two of which merit discussion.[2] First, appellant argues that we should find the evidence factually insufficient to support the verdict. Second, appellant asserts that the military judge erred in admitting statements under the medical hearsay exception. We resolve both issues against appellant.

## BACKGROUND

Beginning in 2000, appellant and JM had a relationship that lasted six or seven years and they had two children together, a son and a daughter. They ended their relationship prior to their daughter, Miss DF, being born in January 2007. When they broke up, appellant and JM had disputes over custody and visitation with the two children. A Georgia court awarded JM custody and established a visitation schedule for appellant.

During the summer of 2013, appellant was stationed at Fort Bliss, Texas. As part of the shared visitation, Miss DF and her brother spent June and July with appellant and his new family in Texas. At the time of the visitation, Miss DF was six years old.

In August 2013, Miss DF, while riding in a car with her brother, JM, and JM's long term boyfriend, SC, made a spontaneous statement that "daddy put [] his pee-pee in my mouth." Within a day, JM reported her daughter's statement to civilian law enforcement.

In March 2014, Miss DF participated in a forensic interview. Miss DF did not make any disclosures of abuse by appellant or state she was afraid of anyone living in her parents' residences. In November 2014, Miss DF participated in a second forensic interview. Miss DF stated she was scared at her first interview but not

---

[2] We briefly address here two of the assigned errors. Appellant requested the court reassess his sentence as being unreasonably severe. Appellant faced a maximum punishment that included life without the possibility of parole. Given the nature and seriousness of the offense of raping a child under twelve, the court does not find appellant's sentence, *inappropriately* severe.

On appeal, appellant also petitioned us for a new trial under Article 73, UCMJ, based on newly discovered evidence. In a separate opinion, we denied appellant's petition. *United States v. Frost*, ARMY 20160171, 2018 CCA LEXIS 76 (Army Ct. Crim. App. 14 Feb. 2018).

We have also considered those matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982) and find they are without merit.

scared at her second interview. During the second interview, Miss DF did not make any disclosure of abuse by appellant.

In April 2015, Miss DF testified telephonically at an Article 32 preliminary hearing. Miss DF did not disclose any sexual abuse by appellant. In September 2015, government prosecutors and paralegals conducted a telephonic interview of Miss DF. During the interview, Miss DF stated nothing happened during the summer of 2013 and did not tell her mother anything happened.

Starting in August 2015, Miss DF had five counseling sessions with Dr. KL, a licensed psychotherapist. During counseling, Miss DF told Dr. KL that appellant "tried to put his pee-wee in [her] mouth."

At the time of trial in 2016, Miss DF was nine years old. Miss DF's testimony of the rape was brief and limited, but consistent with what might be expected from the testimony of a young child. Miss DF testified appellant "put his wee-wee in my mouth." Using an age appropriate description, she also correctly described appellant's penis as being pierced with a ring. The government argued that Miss DF's identification of the penis piercing was something she would only know if she had seen it. The government also introduced prior consistent statements by Miss DF heard by her mother, her mother's boyfriend, and the psychotherapist. To each, Miss DF made a statement to the effect that appellant had put his penis in her mouth.

The defense case focused on DF's credibility, and especially the influence that DF's mother may have had on her testimony. The defense introduced evidence that there was a prior custody battle between appellant and JM. JM admitted during cross-examination that she had been held in contempt by a civilian court for issues arising out of visitation. The defense successfully introduced the four instances where DF had either declined to repeat the accusation against appellant or had affirmatively denied that appellant had done anything wrong.

Additional facts necessary to resolve appellant's assignments of error are provided below.

## LAW AND DISCUSSION

### A. Factual Sufficiency

Under Article 66(c), UCMJ, we may affirm only those findings of guilty that we find correct in law and fact and determine, based on the entire record, should be affirmed. *United States v. Walters*, 58 M.J. 391, 395 (C.A.A.F. 2003). We review both legal and factual sufficiency de novo. *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007). In weighing factual sufficiency, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of

guilt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (A court of criminal appeals gives "no deference to the decision of the trial court" except for the "admonition . . . to take into account the fact that the trial court saw and heard the witnesses"); *see also*, *United States v. Davis*, 75 M.J. 537, 546 (Army Ct. Crim. App. 2015) (en banc), *aff'd on other grounds*, 76 M.J. 224 (C.A.A.F. 2017) ("the degree to which we 'recognize' or give deference to the trial court's ability to see and hear the witnesses will often depend on the degree to which the credibility of the witness is at issue."). "[A]fter weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we must be] convinced of the [appellant's] guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

There are multiple facts in this case which all lend weight to one side of the scale or the other. Unless we were to repeat the trial nearly verbatim, it is difficult to fairly and accurately summarize and explain the weight we give to each piece of evidence. However, several examples illustrate why the evidence convinces us of appellant's guilt beyond a reasonable doubt.

### 1. SC's testimony

JM's former boyfriend SC was a government witness and testified at trial. SC was present in the car when Miss DF made her first statement indicating appellant had raped her. He testified, using language that was similar but not identical to the language of Miss DF and her mother, that Miss DF stated, "Daddy put his pee-pee to my lips." Corroboration of this initial outcry, coming as it did from a witness we assess as credible, and coming before the subsequent consistent and inconsistent statements made during the criminal investigation, forensic interviews, and counseling sessions, gives credence to the government's case.

We credit SC as a credible, disinterested witness for a few reasons. Certainly, he was JM's former boyfriend. However, by the time of trial they had broken up and were not close. He described in testimony his current relationship with JM as "civil." When asked if he was still friends with DF's mother, SC tellingly responded as follows: "Define 'friends.' I mean, I don't, like wish any ill on her." Indeed, SC testified that he believed JM had reported him to the police for breaking into her house. The record reveals no basis to believe that his testimony was not candid, and no reason to lie or shade his testimony in favor of one side or the other.

### 2. JM's testimony

Appellant argued at trial and on appeal that Miss DF's mother fabricated the allegations of rape and coached Miss DF. According to appellant, JM used her daughter as a "weapon" against appellant and was motivated to fabricate the allegations due to a custody dispute with appellant. Our review of the record does

not support that JM was the source of the initial outcry of rape, fabricated the allegations, or coached Miss DF to testify untruthfully.

To be sure, defense counsel successfully demonstrated that parts of JM's testimony–although testimony on two collateral issues–was simply not credible.

First, JM testified that the contempt finding arose out of a "scheduling misunderstanding." The court-martial was not required to accept her explanation.[3] In context, we find her explanation for why she was found in contempt was not credible.

Second, during the cross-examination, defense counsel confronted JM with a Facebook post she had written two years to the day after JM reported appellant to the police. In the post, JM stated that two years ago "I made a decision that would change my life" and that "I struggled with it a week before I acted." The defense confronted JM because her description of a *week-long* struggle was inconsistent with her trial court testimony that she reported the allegations within a day. At first, it appeared defense counsel was trying to capitalize on a minor inconsistency regarding a witness's reconstruction of a timeline two years after the fact.

But that was not the end of JM's explanation. Instead, JM denied that the post was about reporting appellant to the police. She testified that, on the same day she reported appellant to the police, she happened to also have broken up with her boyfriend SC. She then claimed that her Facebook post and her week-long struggle was a reference to her breakup versus any delay in reporting her daughter's rape allegations to law enforcement. This claim was contradicted by SC's testimony in that he stated he broke up with JM in the fall of 2015. In the end, we find her explanation concerning the Facebook post unbelievable.

But, just as we find some aspects of JM's testimony incredible, we find JM at the same time, on more central issues, testified credibly. For example, she testified credibly about her daughter's initial outcry, reasons for seeking counseling for her daughter, and acceptance of the custody arrangement and visitation by the summer of 2013. JM testified that the custody dispute from which the contempt order arose occurred when she and appellant first ended their relationship around 2007. This was years before Miss DF's report of the rape. By 2013, JM was supportive of appellant's visitation with the children and sent them to live with appellant for the summer.

---

[3] On appeal, appellant submitted additional documentation regarding the nature of the 2007 contempt finding. In conducting our review of this case for factual sufficiency, we do not consider evidence from outside the record. Regardless of the specific reasons for the contempt order, JM admitted at trial she was held in contempt during an earlier custody dispute with appellant.

And, on other issues, we do not find defense counsel's attack of JM's veracity convincing or supportive of the defense theme that JM coached Miss DF.

First, Appellant contends that JM is the source of Miss DF's knowledge that appellant wore a penis ring. Although JM testified that during their relationship appellant had worn a piercing through the tip of his penis, she also testified he stopped wearing the piercing continuously before their relationship ended and before Miss DF was born. At trial, appellant introduced a stipulation of expected testimony from his current spouse that he rarely wore the penis ring. Therefore, if JM had coached Miss DF to fabricate her testimony, it would be inconsistent for Miss DF to discuss a penis ring that appellant may have stopped wearing over six years before the rape.

Second, defense counsel tried to establish on cross-examination that, after the initial outcry, JM did not report the allegations to the police right away, but instead went out for dinner and drinks with SC. Appellant asserts JM was unfazed by the outcry since she planted the idea and coached Miss DF to make up the allegation. In our review of the record, this testimony cuts both ways. On one hand, the cross-examination could portray a mother that cared more about a pre-planned dinner date than her daughter's rape allegation. On the other hand, her delay in reporting may actually undermine appellant's contention that JM was motivated by hostility towards appellant regarding custody and fabricated the rape allegation. Her actions were more consistent with SC's testimony that they were surprised by Miss DF's initial outcry. Even after reporting the rape allegations, JM waited over five months to follow-up with law enforcement about the status of the investigation. Again, this delay is inconsistent with the actions of a person allegedly using law enforcement and the judicial process to frame and destroy appellant over custody or for another motive.

On the key aspects of JM's testimony, specifically the content of Miss DF's outcry and the lack of coaching of Miss DF, we find JM credible.

### 3. Miss DF's testimony

Miss DF testified that she understood the difference between truthful and untruthful testimony. Miss DF, in age appropriate testimony, credibly testified that appellant "put his wee-wee in her mouth." She testified that this occurred at appellant's home in Texas during the night. Since her stepsisters were in their room, appellant assaulted her in a hallway. Miss DF testified that appellant's penis was "strange" since there was a "little circle around it."

Appellant argues that Miss DF only repeated the rape allegations when under the influence of her mother. However, if JM was allegedly so manipulative as to coach and manufacture her daughter's testimony, the settings outside of a formal

court would have afforded a better opportunity to accomplish this objective. However, during each of the forensic interviews and telephonic interviews, Miss DF did not discuss her father putting his penis in her mouth. The evidence of Miss DF's lack of disclosures during single forensic interviews and telephonic interviews is more consistent with a young child not being comfortable about discussing the details of her father's action before trusting the setting and person.

Miss DF's counselor, Dr. KL, testified at trial she was treating Miss DF for trauma. During the initial counseling sessions, Miss DF was withdrawn and needed to build trust with Dr. KL. Dr. KL testified that it is common for children to initially have difficulty going into details of a sexual assault. It is traumatic to recall details, and they may have fear and shame in discussing the assault. Only after the initial sessions did Miss DF tell Dr. KL that appellant "tried to put his pee-wee in [her] mouth."

We find there is sufficient evidence to convince a rational trier of fact beyond a reasonable doubt that the appellant is guilty of rape of a child under twelve. Having reviewed the entire record, recognizing that the trial judge saw and heard the witnesses, and applying the framework of our superior court's decision in *Washington*, we likewise are convinced of appellant's guilt beyond a reasonable doubt. 57 M.J. at 399.

## B. Medical Hearsay

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Thompson*, 63 M.J. 228, 230 (C.A.A.F. 2006); *United States v. Marchesano,* 67 M.J. 535, 541 (Army. Ct. Crim. App. 2008) (citation omitted). There is an abuse of discretion when: (1) findings are clearly erroneous; (2) an erroneous view of the law guides a decision; or (3) the decision is not one of the possible outcomes arising from the facts and law of the case *sub judice. United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citations omitted). Under Military Rule of Evidence [Mil. R. Evid.] 803(4), statements made for the purpose of medical diagnosis or treatment are excluded from the general rule prohibiting the admission of hearsay statements at trial.

Among other out-of-court statements by Miss DF, the government admitted the testimony of DF's counselor, Dr. KL. Dr. KL was a licensed psychotherapist with a masters degree in counseling and a doctorate degree in education counseling psychology. Dr. KL met with Miss DF for five, forty-five minute counseling sessions. Dr. KL was not in any contact with law enforcement during the counseling.

Dr. KL testified that during the course of the counseling sessions Miss DF told Dr. KL that she was afraid of appellant and that appellant had "tried to put his pee-wee in my mouth." The defense made a timely objection to the testimony as hearsay.

The government sought to admit this testimony as an exception to hearsay under Mil. R. Evid. 803(4). The issue, both at trial and on appeal, is whether DF's statements were made "with some expectation of receiving medical benefit for the medical diagnosis or treatment being sought." *United States v. Evans*, 31 M.J. 267, 269 (CMA 1990) (quoting *United States v. Edens*, 31 M.J. 267, 269 (C.M.A. 1990)). Our superior court has stated that reviewing courts should consider the age of the child in answering this question. *United States v. Faciane*, 40 M.J. 399, 403 (C.A.A.F. 1994) (quoting *United States v. Williamson*, 26 M.J. 115, 118 (C.M.A. 1988)) ("This Court has recognized that 'there may be some relaxing of the quantum of proof in those situations where a child is being treated. . . .'"); *United States v. Avila*, 27 M.J. 62, 66 (C.M.A. 1988) ("Obviously, very young children will not have the same understanding or incentive as adults when making statements to persons providing health care."). However, those same cases do require some understanding that "the child knows at least that the person is rendering care and needs the information in order to help. . . .". *Id.*; *Faciane*, 40 M.J. at 403.

During her direct testimony, Miss DF remembered seeing her counselor. She then testified as follows:

> Q. Do you remember why - - do you know why you were seeing your counselor?
>
> A. Yeah.
>
> Q. Why was that?
>
> A. Because my dad put his pee-pee in my mouth.
>
> Q. Were you having problems?
>
> A. [Indicating an affirmative response.]
>
> Q. What kind of problems were you having?
>
> A. My dad.
>
> Q. Were you having nightmares?
>
> A. [Nodding Affirmatively].

Dr. KL testified that there had been issues of bedwetting, nightmares, oppositional behavior, some tantrums, not wanting to sleep alone, and not wanting to be alone in her room. She testified that the primary focus of the sessions was to provide treatment, "[t]o provide counseling for [DF]," and to "make sure that she's really focusing on going through the process of understanding her feelings and emotions and providing interventions for her to help her through the process." She was asked how she explained to DF why they were meeting.

> Q. What did you explain to her?
>
> A. That I was going to be there to help her work through her emotions and really - - and that this was a safe place for her, and anything that she wanted to talk about to me that she could, that there would be no judgment, no bias- - biases on my part, and to really just help her through her feelings.
>
> Q. So did you tell her that you were essentially there to try to help her get better?
>
> A. Yes.
>
> Q. Did you in any way indicate to her that you were there to help her prepare for a trial?
>
> A. No.
>
> Q. Did that ever come up?
>
> A. No.

As part of resolving the objection the military judge allowed the defense to voir dire Dr. KL and recessed the court for over an hour to consider the objection. The military judge overruled the defense's objection.[4]

Based on this record, we find as fact that Miss DF's statements to Dr. KL were made, viewed both subjectively and objectively, for the purposes of medical diagnosis and treatment, and were made with the expectation of promoting well-

---

[4] The military judge's ruling was somewhat confusing and may have conflated issues of confrontation with the issue of whether the evidence was sufficient to meet the medical hearsay exception. The military judge did correctly rule that the statements were made for Miss DF's mental health treatment.

being and for the purpose of obtaining medical diagnosis and treatment.[5] *See United States v. Siroky*, 44 M.J. 394, 400 (C.A.A.F. 1996); *Faciane*, 40 M.J. at 403. Having made this factual determination, we quickly conclude that it was not error to admit Miss DF's statements under the medical hearsay exception.

Thus, this case is unlike *United States v. Faciane*. In that case, a child was told they were going to a hospital to "talk to a lady." 40 M.J. at 403. The Court of Appeals for the Armed Forces found the evidence insufficient to support the conclusion "that the child knew that her conversation 'with a lady' in playroom surroundings was in any way related to medical diagnosis or treatment." *Id.* Here, by contrast, the record presented to the military judge indicates a young child who was told and had understanding that Dr. KL was there to "help her through her emotions" and help with her nightmares.

As we find no error by the military judge, we need not address the government's argument that Miss DF's statements to Dr. KL were also admitted as a prior consistent statement. We note, however, that appellant's theory of the case asserted at multiple instances that Miss DF's mother had manipulated her at every stage after DF's initial outcry.[6]

## CONCLUSION

Upon consideration of the entire record, the findings of guilty and the sentence are correct in law and fact and are AFFIRMED.

Senior Judge MULLIGAN concurs.

WOLFE, Judge dissenting;

I find the evidence factually insufficient and therefore respectfully dissent.

---

[5] *See* Article 66(c), UCMJ (authorizing this court to determine controverted questions of fact).

[6] Miss DF's initial statement to her mother and SC in August 2013 was properly admitted by the military judge. A prior consistent statement that precedes an allegation of improper influence is not hearsay. Mil. R. Evid. 801(d)(1)(B). As outlined above, the appellant alleged at trial that Miss DF's mother fabricated and coached Miss DF. The first line of the defense opening statement was, "[T]his case is about what a mom will do to ensure that she does not have to share her children." In closing argument, the defense argued that Miss DF "came in here and repeated what's she's been told to repeat."

In reviewing this case I have struggled with the degree to which I must "recognize" the trial court saw and heard the witnesses when determining whether the evidence is "correct in fact." In *United States v. Crews* we stated:

> The deference given to the trial court's ability to see and hear the witnesses and evidence—or "recogni[tion]" as phrased in Article 66, UCMJ—reflects an appreciation that much is lost when the testimony of live witnesses is converted into the plain text of a trial transcript. While court-reporter notes may sometimes reflect a witness's gesture, laugh, or tearful response, they do not attempt to reflect the pauses, intonation, defensiveness, surprise, calm reflection, or deception that is often apparent to those present at the court-martial. A panel hears not only a witness's answer, but may also *observe* the witness as he or she responds. For instance, a transcript may state "I am showing the witness prosecution exhibit 13 for identification" but will leave unstated the witness's demeanor—whether surprise, recognition, or dread, when reviewing or confronted with evidence.

ARMY 20130766, 2016 CCA LEXIS 127, at \*12-\*13 (Army Ct. Crim. App. 29 Feb. 2016) (mem. op.).

That look of dread on a witness when confronted by evidence, which may be the decisive point in the mind of the fact finder, is entirely absent from a transcript. The Perry Mason moment of trial, if there is one, is obvious to everyone in the gallery, but may pass without notice for those who can only read the transcript pages.

Here, by way of example, the trial counsel's closing argument repeatedly sought to remind the court to assess Miss DF's credibility by remembering not just *what* she said on the stand, but *how* she said it. While I have the benefit of the trial counsel's argument, I cannot completely understand the reference.

I say all this because I am pulled in two opposite directions in this case. There is legally sufficient evidence of appellant's guilt in the record. I am *not convinced*, under any standard, of appellant's innocence. And, I will fully admit the possibility that had I been present at the court-martial I might have been as completely convinced of appellant's guilt as was the military judge in this case.

Yet, at the same time, even after accounting for the fact that the trial court saw and heard the witnesses, I see a reasonable view of the evidence which results in

an acquittal.[7]  Here, the defense introduced testimony that on several occasions Miss DF had omitted or affirmatively denied that appellant raped her.  These occasions included two separate forensic interviews, her testimony at the Article 32, UCMJ, hearing, and a pretrial statement she had made to the prosecutors (arguably, these denials occurred in environments that might be described as more controlled).  The defense successfully introduced concerns about DF's mother's motives to manipulate DF's testimony and successfully impeached the mother's credibility.  In my weighing, filling in these evidentiary holes by "recognizing the trial court's ability to see and hear the witnesses" requires more "recognition" or deference than Article 66, UCMJ, allows.

My colleagues and I have traveled down the same path in this case.  We read the same record.  We apply the same law.  But we nonetheless arrive at a different destination.  And, given Article 66(c), UCMJ, this is to be an expected result; at least occasionally.  I have no legal objection to our inconsistent reads of the evidence.  I am confident we have applied the same law to the same facts – but simply weigh the evidence differently.

Having reviewed the entire record, I am not personally convinced of appellant's guilt beyond a reasonable doubt.  Accordingly, the law compels that I respectfully dissent in this case.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[7] Reasonable people can disagree whether it is wise to have appellate judges review de novo the factual determinations of a trial court.  That policy decision, however, was made by Congress in crafting Article 66(c), UCMJ.